## GRACE METHODIST EPISCOPAL CHURCH, RESPONDENT, *v.* RICKARDS, APPELLANT.

[Submitted April 9, 1895.   Decided April 22, 1895.]

APPEAL—*Setting aside verdict.*—A verdict of the jury, concurred in by the court, will not be disturbed on appeal, unless it clearly appears that there was no evidence at all to sustain the verdict.

NEGOTIABLE PAPER—*Bona fide holder.*—In an action on a promissory note, it appeared that the note in suit was indorsed to the plaintiff, a church society, before maturity, and without notice of any defense thereto, the consideration of the transfer being the surrender of the indorser's individual note, which he had previously executed to the plaintiff as a subscription to aid in the erection of a new church building. *Held*, that the legal attitude of the plaintiff was simply that of any *bona fide* holder of commercial paper who acquired it before maturity, and in the usual course of business, without notice of anything impeaching its validity, and a recovery could be had against the maker of the note.

*Appeal from Second Judicial District, Silver Bow County.*

ACTION on a promissory note.   Judgment was rendered for the plaintiff below by McHATTON, J.   Affirmed.

Statement of the case by the justice delivering the opinion.

Suit upon promissory note made by John E. Rickards, defendant, on February 26, 1884, to the order of the Continental Oil & Transportation Company.   The note was due January

1, 1890.   The Continental Oil & Transportation Company indorsed the note to Samuel Theodore.   Theodore indorsed it, without recourse, to Isaac E. Blake, who indorsed it, without recourse, to J. L. Culin, secretary, and Culin indorsed it to the plaintiff.

The defendant answered that the several transfers of the note were made without consideration, and that the church holds the note as a gift from Blake, and that the note was transferred to prevent Rickards from pleading any defense he might have as against the Continental Oil & Transportation Company, original payees.   Defendant further says that the note was executed by him to the Continental Oil & Transportation Company for the purchase price of certain goods, and the good will of the Continental Oil & Transportation Company in its business at Butte and other Montana cities, but that the individuals, members of the Continental Oil & Transportation Company, after the sale to Rickards, and with the intention of escaping or of evading the obligations of the Continental Oil & Transportation Company, formed another corporation, called the Continental Oil Company, and about March, 1885, did business in Butte, in violation of the understanding between Rickards and the Continental Oil & Transportation Company, and solicited business from the customers of defendant, and by cutting prices and inducing customers to quit dealing with defendant ruined defendant's business, and damaged him in the sum of ten thousand dollars.

Plaintiff's replication denied all the new matter of the answer.   The case was tried to a jury, and a verdict rendered for plaintiff.   A motion for new trial was made, and overruled.   Defendant appeals.

*Forbis & Forbis,* for Appellant.

*Stephen De Wolfe,* for Respondent.

HUNT, J.—In order to make plain the application of the legal principles which must govern in the determination of this

case, it is proper to set forth the substantial facts as they appear in the record.

On February 26, 1884, the defendant was an agent of the Continental Oil & Transportation Company, a corporation in the oil business in Butte, Mont. The defendant, after negotiating with one Blake, president of the corporation, in San Francisco, in February, 1884, purchased of the Continental Oil & Transportation Company their business at Butte and Dillon, Mont. The consideration was $16,000, evidenced by several promissory notes. One of these notes, for $3,000, is the subject of this action. The notes were all made to the order of the Continental Oil & Transportation Company. That corporation, by its president, Blake, duly executed to the defendant a bill of sale, conveying all the property, real and personal, held by the corporation in the territory of Montana, and including likewise the good will of said company in all its business and patronage in said territory. In the spring of 1885, another corporation, the Continental Oil Company, with the said Blake as its president, commenced to do an oil business at Butte. They competed with the defendant in his oil business, and, it would appear, competed successfully.

Blake, for the plaintiff, in the more important parts of his testimony, said: "Mr. Culin was the secretary of the church, the plaintiff corporation. I indorsed that note to Mr. Culin. I purchased it of the company; Mr. Theodore, to whom it was first sold, stating that he believed he could use it. It was first sold to Mr. Theodore, and afterwards he didn't wish to retain it, and wanted to return it, and I said to the company that I would purchase it. I indorsed this note to J. L. Culin, secretary, on behalf of the church. The consideration from the church to me for this note, was this: I attended the Grace M. E. church at San Francisco. During that year the question was discussed of building a new church. I was asked what contribution I would make. I said to the trustees that if the money would be applied to the purchase of a pipe organ I would subscribe three thousand dollars,  *   *   *   *   on

condition that they would give me plenty of time for the pay-
ment of it, * * * and we agreed that for that subscription I
should give my note for five years, and I placed with them
collateral security; * * * * and the note bore interest at
six per cent., due October 1, 1891." "The church people
afterwards wanted the interest on their money. I told them
that I owned the Rickards note for three thousand dollars, in-
terest at eight per cent., due nearly two years before my
paper; that I believed Mr. Rickards was an honorable man,
and I would exchange the Rickards note for three thous-
and dollars, bearing eight per cent., for my own note to
the church, and the collateral. The church people accepted.
The Rickards note was transferred to Culin for the church, in
September, 1887." Witness had heard from one Patterson,
who was connected with the company, of Patterson's impres-
sions that Mr. Rickards might attempt to evade the payment
of the note. "Afterwards I talked with Mr. Rickards, about
1886 or 1887, and told him of Patterson's belief or impression.
He disclaimed that he had ever made any statement to Patter-
son to the effect that he would not pay the note. Aside from
that, I had no knowledge that Mr. Rickards did not intend to
pay. These incidents occurred before I purchased the note.
Mr. Rickards had never made any such claim as that. There
was no defense to this note, so I could not inform Mr. Culin
or the church that he did claim a defense. When I talked
with Mr. Rickards, he disclaimed that he had ever made any
statements to Patterson of that kind. I was then the owner of
the note."

On cross-examination he testified: "There was no agree-
ment, outside of the written agreement, that we would not
establish a business in competition with Rickards." At the
time of the transfer of the note to witness he was president of
the Continental Oil & Transportation Company, and paid the
company full value for the note. At the time of the transfer
witness did not know that Rickards was disputing its legality.
" Mr. Patterson was here (in Butte) and he said that it was

his impression that Rickards would attempt to evade the payment of some of those notes.   At that time (1886) the Continental Oil Company had established a business in Butte, but they were working friendly with Rickards at that time.   At that time, too, Mr. Rickards was buying his goods of the Continental Oil Company.   *   *   *.   *   In 1887 we were in open competition with him.   At that time this note was transferred. · The relations between Rickards and the company were friendly in 1887.   Patterson came up, and afterwards reported to me that he bel'eved Rickards would not pay the note,—I believe some time in 1886.   The Continental Oil Company was in business at that time in Butte.   *   *   *   *   The starting of the new business occurred this way:   The company, to avoid the large credits given to Rickards, proposed to establish a warehouse in Butte, to retain the goods, and thus reduce the credit, and Rickards could get the goods as he required them.   Rickards was buying his goods from the Continental Oil Company,—the new company,—and was representing them as their agent, very much as he had represented the previous company, with no agreement that they should not sell here, but with an outside understanding that when a person is an agent he shall have the exclusive sale.   Soon thereafter Rickards ceased purchasing from the company, whereupon the company sold to anybody.''   The witness Blake was president of the new company, and said that he believed that, even if the old company had no right to compete with the defendant under the terms of the sale to Rickards, yet he believed the new company, which was an entirely different institution, would have a perfect right to do business as it pleased.   The control of the new business was different from the old, there being only one person (witness himself) connected with the two companies. The new company sold oil to the defendant, but when the defendant did not buy exclusively from the new company it entered the field against him.   The witness owned thirty-one and three-tenths per cent. of the stock of the Continental Oil Company, the rest being held by the Standard Oil Company, who

had no interest in the old company. In 1885 one E. R. Barton was an employe of the Continental Oil Company, but had no special authority, except to do such things as he was especially directed to do. The Continental Oil & Transportation Company was never disorganized. The Continental Oil Company was not organized as a consolidation of the Continental Oil & Transportation Company and the Standard Oil Company. The old company continued its business, but sold to the new company its business in certain localities, but Montana was not mentioned as part of the sale, or part of the consideration. When the new company was formed it was understood that business interests would require the old company to retire from the place where the new company intended to do business, but there was no agreement that it should do so. "In using the words, 'matters of consolidation,' in addressing Mr. Rickards in February, 1885, I didn't mean a legal consolidation. I meant that they were getting the stock and offices of the Continental Oil Company and the Continental Oil & Transportation Company into one building. This note in question here was charged to my account with the Continental Oil & Transportation Company. I have paid up my account now. * * * * The church and I have no understanding that I am to pay the amount of this note if this suit is not successful. * * * * I didn't give this note to the church as security. I transferred it to them as an absolute sale. * * * * Neither I nor the Continental Oil & Transportation Company have any interest whatever in the result of this suit. * * * * The Continental Oil Company was organized in December, 1884, at Council Bluffs, Iowa. * * * * In the organization of the Continental Oil Company there was never any consideration paid by the incorporators themselves, or by the shareholders in that company, with regard to these notes, or any indebtedness of Rickards to the Continental Oil & Transportation Company. The object of the formation of the Continental Oil Company was to do a general oil business, and particularly to avoid competition with the Standard Oil Company. It was to protect Mr. Rickards' interests here, as

well as anything else; because the Standard would have advanced into his country, and made his business unprofitable, if he had not purchased his goods from them. There was no connection between the organization of the Continental Oil & Transportation Company and the Continental Oil Company, except a sale to the Continental Oil Company of the old company's plant and stock. It kept all its other property, except this plant and stock, in Colorado, New Mexico, Utah and Wyoming, leaving out Montana, in which it had nothing to sell. Barton never had any interest in the Continental Oil Company." The witness then detailed the stockholders of the new and old companies. But, as we regard the case, it is not important to set forth all that he said in relation thereto.

The defendant gave the history of the purchase by him, as hereinbefore given, saying that he had conducted the business until he was driven out. He continued: "There was no positive agreement between me and the Continental Oil & Transportation Company that I was to purchase from them exclusively. I bought all the goods I could from them, and from the new company, as long as I could have my trade supplied. When the Continental Oil Company established itself in Butte, it commenced a retail business, solicited trade from my customers, and offered them oil at much below the market price. * * * * This continued until I was compelled to sell to them. Prior to this time my business was very prosperous. I was making money. * * * * After the Continental Oil Company established themselves here, my business was very unprofitable. The Continental Oil Company have continued in business here ever since." Witness identified letters from Blake and Barton. "In 1884, Mr. Blake was in Butte, and said to me, 'Mr. Patterson tells me that you say that you will refuse to pay those notes.' I simply replied, 'Mr. Patterson put those words into my mouth.' Patterson came out as an officer of the Continental Oil Company. He came to my office, and said they were about to establish a business here. I showed Patterson the bill of sale, and, after reading it, he passed it back to me, saying I was a fool to pay a dollar of

these notes I gave to Mr. Blake by virtue of this contract or
bill of sale.     I replied, 'I never will.' ''     When cross-ex-
amined, the witness testified that he bought oil from the Con-
tinental Oil Company after they established a business in Butte,
and that he sold out to the Continental Oil Company the build-
ings and plant that the Continental Oil & Transportation Com-
pany had sold to him, for which these notes were given in con-
sideration.     "I was obliged to sell to them.     I got from the
new company more than I had paid for it to the old company,
but there was a great deal of property added to it."

The correspondence referred to in the testimony of the wit-
nesses was certain letters written by Isaac E. Blake, recogniz-
ing that perhaps under the old agreement between the Con-
tinental Oil & Transportation Company and the defendant,
Rickards, the Continental Oil Company were not to compete
with the defendant, but justifying their competition upon the
ground that the new company was not the old, and that the
defendant had purchased oil from other parties.     Two or three
of the letters were signed by E. R. Barton as manager of the
Continental Oil Company.     They were addressed to the de-
fendant, and told him that the Continental Oil Company would
establish a regular agency at Helena, in which case the Stand-
ard Oil Company would withdraw entirely from Montana, and
informed the defendant that the Continental Oil & Transporta-
tion Company and the Standard Oil Company were consoli-
dated under the name of the Continental Oil Company.     One
of the letters, dated February 10, 1885, written by Isaac E.
Blake to the defendant, stated that the writer had a general
impression in regard to the understanding between defendant
and the Continental Oil & Transportation Company that they
did not intend to sell any goods in Montana, except to defend-
ant, and assuring defendant that the Continental Oil & Trans-
portation Company would do all in their power to help defend-
ant to succeed.

The principal ground upon which appellant asks for a re-
versal of the case is insufficiency of the evidence to support the

verdict of the jury. But after a close examination of the record we are constrained to hold that, if the testimony of the witness Blake was credible, there is ample evidence to prove that there was a consideration for the transfer of the note sued on from Blake to the plaintiff church. The exchange of the notes, and the history of the facts which led up to the transaction whereby Blake gave to the church the note of Rickards, which was due before his own note was, is plausible, probable and uncontradicted. Moreover, it was, in the eye of the law, a proper transaction. The paper was a negotiable note, indorsed to the plaintiff before maturity for a valuable consideration, and the plaintiff church, under the evidence, never had the slightest intimation, at the time the note was transferred to it by Blake, or prior thereto, that there was any defense whatever to be made to its payment. It may be that appellant's necessary premise is well founded,—that Blake was a knave; but, assuming that he was, the last act that he would have done, it occurs to us, would have been to inform the victims of his knavery concerning the facts and circumstances which would at once have precluded them from being victimized by him. But we think it is altogether incredible that the secretary of a corporation, even though it be an ecclesiastical organization, should be so wholly guileless as to deliberately accept an unsecured promissory note, with the full knowledge of the fact that the maker would refuse to pay it, and that its collection could only be enforced by legal proceedings, in exchange for one already held by the corporation, and well secured by collateral. The only rational explanation for the exchange is in harmony with Blake's testimony, namely, that the church wanted money, and that they were induced to act in the matter by the more tempting rate of interest which appellant's note bore, and by the fact that it matured before Blake's paper did, and might be more speedily collected.

The pecuniary value of the note in suit, and the responsibility of Mr. Rickards, the maker, were never carefully investigated or questioned. Mr. Blake assured the secretary of

the church that Mr. Rickards was a man of honorable character, which of course carried with it, when sold to an innocent purchaser, without further explanation, an implied assurance that the note would be paid when it matured, provided, of course, the maker was able to meet it. This statement concerning the maker doubtless carried great weight with it, when it is remembered that it was made to the church by one of its prominent members, whose veracity there was no reason to suspect, and whose munificence was most distinguished by his liberal gift. Moreover, they were led to believe by Mr. Blake that he considered the appellant's note good, and that, if their financial exigencies required a speedy relief, it was best for them to accept the Rickards note, which would be paid earlier than his own. It is evident, and the presumption is, that the secretary of the church corporation and Blake acted intelligently with one another, even though the church may have been too trustful in Blake; and our views concerning the whole transaction but conform to the just and fair deductions from the testimony. We regard the circumstance that the church did not inquire of appellant concerning this note as a bit of evidence strongly tending to show their reliance upon the assurance of their friend Blake, and their entire innocence in the acquisition of appellant's obligation. And no matter how similar may have been the traits of character which Blake developed to the traditional Mephistopheles, to whom appellant's counsel has compared him, the all-important fact stands out in bold relief that this plaintiff is not shown to be, directly or indirectly, a party to any misconduct or collusion or fraud of any kind whatsoever. Their legal attitude is, therefore, simply that of any bona fide holder of commercial paper who acquired the same before maturity, and in the usual course of business, without notice of anything which impeaches its validity. Thus they are brought within the elementary rules of law which enable them to recover as against the maker of the note, even though as between him and the original payee equities existed which could have been availed of. (*Brooklyn, etc., Railroad Co.* v. *National Bank,* 102 U. S. 14.)

The jury saw and heard Blake testify. They had the great advantage of observing his presence; his manner upon the witness stand; his honesty or dishonesty of countenance, his method of speech,—whether he hesitated or was glib of tongue, or nervous or collected; and finally they could impartially and calmly say, after deliberating upon his testimony, whether or not it was truthful or untruthful. With no interest in the result of the trial, and with due regard for the responsibility of their duties as the exclusive judges of the credibility of the witnesses, they have decided that Blake told the truth. The learned judge of the district court also had the advantage of seeing and hearing Blake upon the trial, and after due deliberation he concurred with the jury in believing that the plaintiff had made out its case, and was in good faith the holder and owner of·the note in suit.

When we consider these matters, this court, by the authority of an unbroken line of precedents, which have guided its decisions pertaining to the weight to be given to verdicts for upwards of a quarter of a century, and which are contained in nearly every volume of reports that has been published, cannot now disturb the verdict of the jury and the judgment of the lower court.

The attempt to prove that the Continental Oil & Transportation Company and the Continental Oil Company were one and the same thing was a failure. It is true that the witness Blake was interested in both, but it clearly appeared that he was the only stockholder in the Continental Oil & Transportation Company who participated in or owned stock in the new company. The old company seems to have been swallowed up by the Standard Oil Company, or its shareholders. The new company was organized on a different basis from the old, had a different name, and was owned by different parties. It had a perfect right to enter into business anywhere it pleased, and could not at law be precluded from doing so by virtue of any arrangement entered into between the appellant and another different corporation, made some eighteen months before. The

evidence fails to show that Blake was guided by a sinister motive in promoting the new corporation into existence. But, whatever motive he had, it becomes quite immaterial in the face of the fact that he did not control the stock in the new organization, and could not, even had he desired to do so, have used it for the purpose of defeating the collection of the note involved in this suit, unless by sanction or authority of the trustees of the new corporation, who were in no way interested in the Continental Oil & Transportation Company, the payee of the note, or in the note itself, or in this suit.

Other errors are assigned, but, as what we have said disposes of the case, they need not be considered at length. Taking the instructions as a whole, we think they fairly state the law pertinent to the case. Nor do we think there was any mistake in excluding certain letters written by Barton to appellant. The two corporations being clearly legally distinct, any letter of the Continental Oil Company was immaterial and irrelevant to the issues of the pleadings.

The judgment must be affirmed.

*Affirmed.*

PEMBERTON, C. J., concurs.