FILED

March 29 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0529

DA 14-0529

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 77

GENE R. CURRY, CHERYL S. CURRY, and
CURRY CATTLE CO.,

>Plaintiffs, Counterclaim-Defendants
>and Appellants,

v.

PONDERA COUNTY CANAL & RESERVOIR
COMPANY,

>Defendant, Appellee and Cross-Appellant.

APPEAL FROM:     Montana Water Court, Cause No. WC 2006-01
                      Honorable Russ McElyea, Chief Water Judge

COUNSEL OF RECORD:

>For Appellants:
>
>>Holly Jo Franz (argued), Ada C. Montague, Franz & Driscoll, PLLP,
>>Helena, Montana
>
>For Appellee:
>
>>John E. Bloomquist (argued), Bloomquist Law, P.C., Helena, Montana
>
>For Amicus Curiae Montana Trout Unlimited:
>
>>Laura S. Ziemer, Patrick Byorth, Meg Casey, Montana Trout Unlimited,
>>Bozeman, Montana

For Amicus Curiae Montana Water Resources Association:

Michael J.L. Cusick, Abigail R. Brown, Moore, O'Connell & Refling, PC, Bozeman, Montana

Argued and Submitted:  September 30, 2015

Decided:  March 29, 2016

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 Gene R. Curry, Cheryl S. Curry, and Curry Cattle Co. (Curry) appeal from an order of the Montana Water Court that determined Pondera County Canal & Reservoir Company (Pondera) is entitled to claim beneficial use based on the maximum number of shares authorized by the Montana Carey Land Board (MCLB), a service area for its place of use, the extent of the acreage included in the service area, the adjustment of the flow rate for Claim Nos. 41M 162000-00 and 41M 162109-00, and the reversal of the dismissal of Claim No. 41M 199797-00. Pondera cross-appeals from the portion of the order regarding the tabulation for Claim Nos. 41M 131103-00 and 41M 199796-00. We affirm in part, reverse in part, and remand for further proceedings.

## ISSUES

¶2 We review the following issues:

*1. Did the Water Court err when it determined the water rights of an entity developed under the Carey Land Act for the purpose of sale or rental are not limited by the stockholders' actual historic water use?*

*2. Did the Water Court err when it granted Pondera a "service area" rather than a place of use based on historically irrigated land?*

*3. Did the Water Court err by ruling Pondera's storage rights were beneficially used on the Birch Creek Flats prior to 1973?*

*4. Did the Water Court err by substituting its judgment for the trier of fact in regard to Claim Nos. 41M 162000-00 and 41M 162109-00 (Gray Right), and Claim No. 41M 199797-00?*

*5. Should the Water Court's tabulation for Claim Nos. 41M 131103-00 (Curry claim) and 41M 199796-00 (Pondera claim) include volume measurements?*

We address each issue in turn.

3

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    The present case originates from a water distribution controversy on Birch Creek, a tributary of the Marias River.  Both Curry and Pondera own rights to divert waters from Birch Creek.  This case is before this Court as a result of a certification order from the Ninth Judicial District Court, Pondera County, which referred the case to the Water Court for the "determination of the existing water rights that are involved in [the] matter."  The water rights that are the subject of this appeal are located in the Marias River Basin, 41M, which has yet to receive final adjudication.  Subsequent to the filing of this appeal a preliminary decree was entered, and now it controls the rights in the Basin.  Accordingly, the Court recognizes all water users in this Basin, including the parties to this appeal, will have an opportunity to fully participate in the adjudication process and additional litigation related to the rights at issue herein may occur.

### A.    Historical and Factual Background

¶4    Pondera is a water supply company organized under Montana law, which supplies water to Pondera County residents primarily for irrigation.  Pondera owns rights to divert water from Birch Creek.  In addition to its Birch Creek water rights, it owns a complete distribution system, including canals, ditches, siphons, and headgates.

¶5    Pondera's predecessors secured some of its water rights through use of the Carey Land Act, a federal act that encouraged settlement of the arid West.[1]   43 U.S.C. §§ 641-644 (2012).  This federal law provided for the passage of fee title to federal lands

---

[1] *See also Valier Co. v. State*, 123 Mont. 329, 215 P.2d 966 (1950) for a discussion of the procedures of the Carey Land Act.

to state settlers if the state complied with various prerequisites. To ensure the procedures were properly followed states created Carey Land Boards to manage the process. Typically, Carey Land Act projects occurred and passed title in a systematic fashion. First, the federal government promised title to arid lands to a state upon the conditions of both reclamation and actual settlement of the land. Next, the state contracted with a construction company to construct an irrigation system to service the land and to secure settlement of the land by settlers. Once construction of the irrigation system was complete, the state could request the patents of the land from the federal government. Upon approval by the Carey Land Board, the construction company could sell shares of stock in an operating company to settlers and the state could sell the patented land serviced by the irrigation system to the stockholder-settlers. Thus, the operating company was comprised of stockholders who had the right to water per acre of land owned, and also proportionate ownership in the irrigation system. Once 90% of the total stock was sold by the construction company to settlers, the ownership of the system was turned over to the operating company. Ultimately, the settler-shareholders owned the land upon which the water was used, had ownership in the operating company, but the operating company itself retained ownership of the water rights.

¶6    The original appropriators of the rights now owned by Pondera began appropriating water for the purpose of irrigating and selling water to other irrigators. The Conrad brothers acquired these rights and appropriated water in order to irrigate approximately 50,000 acres of their land in the Marias River Valley. At some point in the late 1800s, the Conrads hired an engineer to construct a ditch system to divert water

5

from Birch and Dupuyer Creeks, which was approximately fifty miles in length and irrigated a portion of their land, in the range of five to six thousand acres. This land was irrigated under the Conrad Investment Company. The Conrads also organized the Pondera Canal Company to sell water they diverted from the Lake Francis Reservoir into a diversion to the Dry Fork of the Marias. This company project irrigated approximately 13,000 acres of shareholder land. The current Pondera project is an extension of these two original systems.

¶7      In 1908 the Conrads sold their land and holdings to W.G. Cargill. Cargill and the same engineer hired to develop the Conrads' first original system then began efforts to irrigate under the then recently-enacted Carey Land Act provisions. Pursuant to the Carey Land Act, two companies were formed: a construction company and an operating company. The operating company went through various name changes and was eventually organized as Pondera in 1927. In 1948, the physical construction of the project was completed and a request for final approval was filed with the MCLB. The MCLB approved the project as complete in 1953, at which time Pondera took ownership of the project from the construction company. Prior to the MCLB's final approval, the development of the project required an independent assessment of the ability to provide an adequate supply of water. Both the MCLB and the federal government were involved in determining whether the Pondera project could properly supply water to its shareholders.

¶8      Similar to other operating companies formed under the Carey Land Act, Pondera is owned by its membership and water is distributed to shareholders on a

6

per-share-owned basis. Generally, the water rights are appurtenant to the land described in the share certificates issued by Pondera to its shareholders. Under the development of the project the settler-shareholders did not receive individual water rights to irrigate their land, but instead they received the right to available water in common with other settler-shareholders regardless of when they purchased their shares or when they initially irrigated their land.

¶9 Initially the Pondera project sought to irrigate 160,000 acres. Over time this irrigable acreage amount was reduced. The State engineer assigned to the project concluded in his final evaluation that the lands contemplated would be serviced by the issuance of a maximum of 72,000 shares, with each share equivalent to one acre of irrigable land.[2] Pondera's bylaws contemplate the movement of water within the project's boundaries. Specifically, they state:

> [T]he shares and water rights evidenced thereby shall become and forever be inseparably appurtenant to such lands, subject, nevertheless, to the power of the Board of Directors of this corporation, for good cause shown, at the request and with the consent of the owner thereof, to make said certificate of stock appurtenant to other land which is so located that the Irrigation System as then and now constructed can readily and efficiently serve the same.

¶10 Curry is a private landowner with irrigation water rights at various locations in an area known as the Birch Creek Flats (the Flats). Curry came into possession of his lands and appurtenant water rights beginning in 1988. Some of Curry's rights are of the oldest in Basin 41M. For many years, Curry and Pondera both received water from Birch Creek

---

[2] While there was no volume determination made by the MCLB, Pondera has followed the issuance of 18 inches of water per acre of land, ultimately dependent on the availability of water for that season, and subject to change throughout the season.

7

despite disagreeing over the priorities of each other's rights. In 2004, Pondera advised Curry of what it believed to be the extent of Curry's water rights, which was less than what had been previously indicated by a former Pondera employee. Then in 2005 Pondera locked Curry's headgate, which left him without water and ultimately led to the current dispute.

### B. Procedural History

¶11 In June 2005, Curry filed a complaint in the Ninth Judicial District Court, Pondera County, which alleged interference with his water rights by Pondera. In August 2005, Curry filed a motion for preliminary injunction and certification to the Water Court for a determination of Curry's and Pondera's competing water right claims. The District Court certified the case to the Water Court regarding the determination of the water rights, and conducted a hearing regarding the issuance of a preliminary injunction. In May 2006, the District Court issued a preliminary injunction that enjoined Pondera from interfering with Curry's water diversion from Birch Creek.

¶12 Upon certification to the Water Court, the case was referred to a Water Master to hear all matters in the case. In August 2008, Curry filed a motion for partial summary judgment and to compel discovery. Initially Pondera claimed a "service area" of 377,813.5 acres as its place of use. In its summary judgment briefing, Pondera conceded that the 377,000-acre service area did not accurately represent actual irrigated acreage, and agreed it would not oppose the removal of the acreage amount as its place of use. Instead, it stated it would agree to use the legal descriptions of the land within the service area, as identified by Township and Range, as the appropriate descriptor of the service

8

area. A six day hearing was held that involved extensive testimonial and documentary evidence regarding all of Curry's and Pondera's water right claims on Birch Creek.

¶13 In April 2013, the Water Master issued a report with findings of fact and conclusions of law regarding each claimed water right. The Water Master found, in part, that the maximum number of acres Pondera is allowed to irrigate is 57,073 acres within the designated place of use. The Master found although the MCLB authorized the sale of 72,000 shares (i.e. representing 72,000 irrigable acres), the evidence showed the greatest number of actual irrigated acres prior to the implementation of the Montana Water Use Act (WUA) in 1973[3] was 56,556 in 1921. Further, even post-WUA the greatest number of actual irrigated acres was 70,030 in 2003. Thus, according to the Master, 72,000 acres were never historically irrigated since the project's completion and the 57,073-acre figure represents the greatest number of actually irrigated acres pre-WUA, plus an allotment for an amount of water to service the shareholder city of Conrad.

¶14 In regard to the place of use, the Master found Pondera's claim of a service area of over 377,000 acres was based on convenience because it was the amount of land Pondera's entire infrastructure could potentially service, but had never historically serviced. In lieu of Pondera's requested use of a service area for its place of use, the Master found the land described on the share certificates with appurtenant water rights is the only land that can and should be irrigated by Pondera water. The Master cited *McDonald v. State*, 220 Mont. 519, 722 P.2d 598 (1986), and *Schwend v. Jones*, 163

---

[3] The implementation of the WUA, codified at Title 85, MCA, is significant because after this date all water users are required to comply with the Act for any changes made to a water right.

9

Mont. 41, 515 P.2d 89 (1973) in support of the appurtenance requirement. The Master requested Pondera supplement the record with a list of share certificates issued with the appurtenant acres stated as of July 1, 1973, the date the WUA went into effect. According to the Master, after allowing Curry to respond to the list, the historical place of use could then be accurately determined. The Master noted:

> The place of use so delineated will be larger than the number of historically irrigated acres, because shareholders have the flexibility to irrigate less than all of their acreage at any time . . . . For example, if a share certificate is for 40 acres and describes the S2SE section 17 (80 acres), the place of use will be S2SE of section 17. The shareholder may use the allotment of 40 shares' water on any of the 80 acres described in any given year. If the shareholder wishes to use those shares to irrigate land in the N2SE of section 17, a [Montana Department of Natural Resources and Conservation (DNRC)] change authorization is required. This is no more and no less than is required of any other water right holder in Montana.

¶15 The Master also excluded the Flats from Pondera's service area. The Master stated that while Pondera did at times release water to ditches on the Flats, the water used on the Flats prior to 1973 was non-Pondera water. The Master explained:

> There is evidence that [Pondera] accommodated other water users on the Flats from time to time. [Pondera] asserts that it released water to non-project users in order to be a good neighbor, without regard for priority dates, and that it did not distinguish whether it was using direct flow water or stored water. . . . . When [Pondera] accommodated its neighbors, at times it was effectively honoring their senior rights. Senior direct flow rights in priority are by definition using the unstored flow of the source. [Pondera] may have voluntarily substituted stored water [but]. . . [t]hat practice did not create storage rights for the neighbors who were accommodated. [Pondera] may have had no idea what the instantaneous natural flow of Birch Creek was at the time. In comparison to the size of the [Pondera] enterprise, the few second feet needed by a user on the Flats were minimal. [Pondera's] practice of accommodating non-[Pondera] water users on the Flats from time to time did not make the users' ditches on the Flats part of [Pondera's] historical delivery system.

10

¶16 In April 2014, the Water Court issued an order amending and partially adopting the Master's report. The court disagreed with the Master's conclusions regarding the maximum number of acres that Pondera could irrigate, the size of the place of use, or service area, and the exclusion of the Flats in the service area. Instead, the court found the number of shares authorized by the MCLB accurately reflects the number of acres Pondera is allowed to irrigate. The court reasoned that at the time the MCLB fixed the 72,000 share limit 69,257 acres had already been sold to landowners. Thus, due to the intent of the project and the State's determination of the maximum allowable irrigable acres, the Master improperly diluted the value of the shares.

¶17 The court further determined there was no legal basis for the Master's conclusion that the land described on the share certificates as of July 1, 1973, was the place of use or service area. It found Pondera is entitled to claim a service area for its place of use. Furthermore, it found the 377,000-plus acres Pondera originally claimed as its service area is appropriate. The court stated Curry was unable to sufficiently meet his burden of proof to show Pondera's service area of 377,255.5 acres as claimed in 2007 is not the appropriate assessment. The court also found the Flats to be within Pondera's service area. The court stated the Flats should be included because Pondera had historically delivered direct flow along with stored water to the Flats for use by non-shareholders.

¶18 Curry timely appeals, and Pondera timely cross-appeals, from the Water Court's order.

**STANDARDS OF REVIEW**

¶19 Two standards of review are relevant to this case because it involves a Water Master and the Water Court. First, the Water Court must review the factual findings in the Water Master's report for clear error, and the conclusions of law in the report for correctness. Second, whether the standard of review was correctly applied by the Water Court is a question of law, which we review de novo. *Heavirland v. State*, 2013 MT 313, ¶¶ 13-14, 372 Mont. 300, 311 P.3d 813. Therefore, we review the Water Court's order to determine whether it correctly applied the appropriate standards of review to the Master's findings of fact and conclusions of law. If we find the Water Court correctly set aside a factual determination made by the Master, we review its substitute or additional findings for clear error. *Skelton Ranch, Inc. v. Pondera Cnty. Canal & Reservoir Co.*, 2014 MT 167, ¶ 26, 375 Mont. 327, 328 P.3d 644 (citations omitted).

¶20 We have previously set forth a three-part test for determining clear error. First, the reviewing court reviews whether the findings of fact are supported by substantial evidence. Second, even if the findings are supported by substantial evidence, a finding may still be clearly erroneous if the trial court misapprehended the effect of the evidence. Third, even if the findings are supported by substantial evidence and the court has not misapprehended the effect of the evidence, a finding may be clearly erroneous when although there is evidence to support the finding, when looking at the evidence as a whole the court is left with the definite and firm conviction that a mistake has been committed. *Marks v. 71 Ranch, LP*, 2014 MT 250, ¶ 12, 376 Mont. 340, 334 P.3d 373. Substantial evidence is evidence that a reasonable mind might accept as adequate to

12

support a conclusion, even if the evidence is weak or conflicting. It need not equal a preponderance of the evidence, but it must be more than a scintilla. Although the standard is deferential, it is not synonymous with clearly erroneous and a reviewing court may find a finding clearly erroneous even though there is evidence to support it. *Skelton Ranch, Inc.*, ¶ 27 (citations omitted).

**DISCUSSION**

¶21 *1. Did the Water Court err when it determined the water rights of an entity developed under the Carey Land Act for the purpose of sale or rental are not limited by the stockholders' actual historic water use?*

¶22 In his report, the Master determined Pondera's water rights developed under the Carey Land Act should be limited to the actual acreage historically irrigated by the shareholders. The Water Court, however, determined the water rights should be limited to the number of shares authorized by the MCLB upon completion of the system. Both the Master and the court based their determinations in the principles of Montana water law.

¶23 Curry argues beneficial use of water is "the basis, the measure, and the limit of all water rights in Montana, including the rights of water supply companies" such as Pondera. Curry maintains the Water Court's order and reasoning improperly places Pondera's water rights in an advantageous position over those of any other water user. Curry argues that the court incorrectly interpreted *Bailey v. Tintinger*, 45 Mont. 154, 122 P. 575 (1912), by removing the requirement that water used for sale or rental be limited by historic beneficial use.

13

¶24 Pondera argues its beneficial use is not the actual irrigation of lands, but instead putting the water into service for shareholders for irrigation. Thus, it maintains the Water Court correctly held, pursuant to *Bailey*, that Pondera has the right to rely on the maximum number of shares authorized by the MCLB (72,000) as the amount of acreage it can irrigate, not the historic number of acres actually irrigated by the shareholders.

¶25 The controlling principle of Montana water law is the right to beneficially use water—without beneficial use the right ceases. *Power v. Switzer*, 21 Mont. 523, 529, 55 P. 32, 35 (1898); *Quigley v. McIntosh*, 110 Mont. 495, 505, 103 P.2d 1067, 1072 (1940). Whether an appropriation is made for a beneficial or useful purpose is a question for the courts to determine based on the appropriator's intent, and contemplated and actual use. *Toohey v. Campbell*, 24 Mont. 13, 17-18, 60 P. 396, 397 (1900). The appropriation of water for sale has long been accepted as a beneficial use. *Bailey*, 45 Mont. at 175, 122 P. at 582; *Sherlock v. Greaves*, 106 Mont. 206, 218, 76 P.2d 87, 91-92 (1938); *State ex rel. Normile v. Cooney*, 100 Mont. 391, 408, 47 P.2d 637, 645-646 (1935); Mont. Const. art. III, § 15 (1889); Mont. Const. art. IX § 3 (1972). Our first Constitution in 1889 explicitly recognized the right to sell and rent water to others as a beneficial use. Mont. Const. art. III, § 15 (1889).[4] The verbiage used in the 1889 Constitution referencing the sale of water was imported almost verbatim nearly one hundred years later into the 1972 Constitution. *Compare* Mont. Const. art. IX, § 3 (1972) *with* Mont. Const. art. III, § 15

---

[4] Article III, Section 15 of the 1889 Montana Constitution states in part: "The use of all water now appropriated, or that may hereafter be appropriated for sale, rental, distribution or other beneficial use and the right of way over the lands of others, for all dithes [sic], drains, flumes, canals and acque-ducts, necessarily used in connection therewith, as well as the sites for reservoirs necessary for collecting and storing the same, shall be held to be a public use."

14

(1889). This constitutional provision, along with its interpretations in our case law, clearly shows a steadfast commitment to recognizing the ability to appropriate water for its ultimate use by a third party.

¶26 The parties rely on *Bailey* as the guidepost decision, but disagree over its meaning. We agree *Bailey* applies to the instant case, and highlight its applicability with the following analysis. To begin, the crux of *Bailey* was a dispute between landowners with individual water rights and those who received water from an irrigation system operated by a canal company. *Bailey*, 45 Mont. at 160, 122 P. at 576.

¶27 In *Bailey*, the defendant canal company began construction of its water distribution system pursuant to the Carey Land Act with the intention to service settler-irrigators from Big Timber Creek. *Bailey*, 45 Mont. at 160-161, 122 P. at 577; *Bruffey v. Big Timber Creek Canal Co.*, 137 Mont. 339, 341, 351 P.2d 606, 607 (1960). The defendants' predecessors began appropriating water in 1892 with the intent to irrigate and provide water for sale. *Bailey*, 45 Mont. at 160-161, 122 P. at 577. A canal company succeeded the original appropriators' interests and continued to expand the system, completing most of the system by 1896. *Bailey*, 45 Mont. at 161, 122 P. at 577. Eventually the defendants acquired the original canal company's rights, and "did considerable work on" the irrigation system in 1910. *Bailey*, 45 Mont. at 161, 122 P. at 577.

¶28 The plaintiffs brought suit to determine the extent of the defendants' water rights and the case was tried in December 1910. *Bailey*, 45 Mont. at 161, 122 P. at 577. The trial court found the defendants furnished to their customers: 835 miner's inches in 1908;

15

926 inches in 1909; and a maximum of 1,150 inches in 1910. *Bailey*, 45 Mont. at 161, 122 P. at 577. The trial court did not enter any specific findings of fact, but determined the defendants' rights were limited to 1,000 miner's inches. *Bailey*, 45 Mont. at 161, 122 P. at 577. The defendants appealed arguing the trial court's determination was not supported by the evidence. *Bailey*, 45 Mont. at 161, 122 P. at 577. The plaintiffs-respondents argued the defendants' "considerable work" amounted to "an enlargement of the [system], as distinguished from repairs or cleaning[.]" *Bailey*, 45 Mont. at 162, 122 P. at 577.

¶29 On appeal, this Court concluded that the carrying capacity of the system prior to the 1910 work was 1,240 inches, and after the work, which we determined was cleaning not enlargement, was 2,200 inches. *Bailey*, 45 Mont. at 162-163, 164-165, 122 P. at 577-578. We also held in certain circumstances water possession can either be actual or symbolized by the completion of preparatory work necessary to take actual possession. *Bailey*, 45 Mont. at 174, 122 P. at 582. We stated:

> [W]e base our conclusion that, as to a public service corporation, its appropriation is complete when it has fully complied with the statute and has its distributing system completed and is ready and willing to deliver water to users upon demand, and offers to do so. The right thus obtained may be lost by abandonment or nonuser for an unreasonable time (1 Wiel, sec. 569), but cannot be made to depend for its existence in the first instance upon the voluntary acts of third parties—strangers to its undertaking.

*Bailey*, 45 Mont. at 177-178, 122 P. at 583.

¶30 Finally, we concluded the appropriator's needs and capacity measure the extent of the appropriation. "If [the] needs exceed the capacity . . . of [the] diversion, then the capacity of [the] ditch, etc., measures the extent of [the] right. (*McDonald v. Lannen*, 19

16

Mont. 78, 47 P. 648). If the capacity of [the] ditch exceeds [the] needs, then [the] needs measure the limit of [the] appropriation." *Bailey*, 45 Mont. at 178, 122 P. at 583.

¶31 As applied to the facts here, the main propositions that emerge from *Bailey* are that either the system's capacity or the company's needs will determine the extent of the water right, wherein if the needs are less than the capacity, then the measurement of the needs becomes the cap to the water right, and beneficial use is not in-fact use of water *by* the irrigators, but the company's ready availability of water *to* the irrigators. *Bailey* does not circumvent the fundamental water law maxim that water must be put to beneficial use. Instead, it clarifies a specific way in which water is put to beneficial use that is different from the typical actual, on-the-ground use of water. Still, water's beneficial use is required for all water appropriators; however, pursuant to *Bailey* whether it has occurred may be determined by the company's actions, not those of the shareholders who decide if and when to apply the water to its ultimate, actual use. *Bailey*, 45 Mont. at 176, 177-178, 122 P. at 582-583.

¶32 Pondera and its predecessors sought to make water available for sale to irrigators in the Basin. In fact, the sole purpose of Pondera's existence was to sell water availability to its shareholders. The federal Carey Land Act, ratified by the states' own sister Acts, required that there be enough water available to adequately irrigate the settlers' land. 43 U.S.C. § 641. The availability of water was determined by the state Carey Land Board and reviewed by the federal government. Here, the final report by the State engineer for the MCLB fixed the maximum number of shares that could be issued by Pondera at any single time at 72,000. This meant Pondera had the ability to issue to

17

shareholders the right to use water to irrigate no more than 72,000 acres of irrigable lands within the area developed under the Carey Land Act and serviced by the system. An additional requirement under the Montana Carey Land Act statutes was that 90% of the authorized shares must be sold by the construction company to settlers prior to the operating company taking ownership of the project, which occurred in this case. Section 81-2111, RCM (1947) (repealed 1965). Therefore, there was enough water available to irrigate 72,000 acres, as determined by the MCLB, and there were enough qualified settlers who bought into the system and began using the water, as determined by the ownership transfer to the operating company Pondera. After the MCLB certified the project in 1953, Pondera had the ability to continue to issue shares to shareholders until it reached the issuance maximum of 72,000 allowed shares for a reasonable amount of time, and the record indicates Pondera continued to do so.

¶33 We have held:

> [A] corporation [that] does not own, control, or possess any land is organized for the purpose of selling or renting water to settlers to irrigate arid lands; that it proceeds under the statute to make its appropriation and fully complies with all the statutory requirements, completes its distributing system, and is ready and offers to supply water to settlers upon demand. Now, if the corporation can ever make an appropriation, it has done so, for it has performed every act which it can perform. It cannot use the water itself, for it has no land or other means of use. Any further acts must be performed by its customers who are to be the users.

*Bailey*, 45 Mont. at 175-176, 122 P. at 582. Furthermore, "[i]t is clearly the public policy of this state to encourage these public service corporations in their irrigation enterprises, and the courts should be reluctant to reach a conclusion which would militate against that policy." *Bailey*, 45 Mont. at 177, 122 P. at 583. Therefore, it would be against the policy

18

and intent of the Carey Land Act, as well as Montana law, to hold the acreage actually irrigated by the irrigators should limit Pondera's water rights developed pursuant to the Carey Land Act. Instead, these rights are limited by the actual shares issued by Pondera within a reasonable amount of time after the completion of the Carey Land Act project in 1953, in the amount determined by the MCLB. *Bailey*, 45 Mont. at 178, 122 P. at 583. *See also Aberdeen-Springfield Canal Co. v. Peiper,* 982 P.2d 917, 922 (Idaho 1999) (concluding, "A finding of forfeiture in this case, where the appropriator [canal company] did nothing to cause the nonuse of the water, would have troubling consequences for all Carey Act operating companies. Such a ruling would give stockholders, who are not appropriators, the power to determine the fate of [the canal company's] water rights.").

¶34   As stated, because beneficial use is a key tenet of water law Pondera must continue to put its water to beneficial use within the confines of the law. While the sale of water is unquestionably a beneficial use, *Bailey* clearly states that though the right cannot be lost based upon the acts by a third-party shareholder, it can nevertheless be lost by nonuse or abandonment. Mont. Const. art. IX, § 3 (1972); *Bailey*, 45 Mont. at 178, 122 P. at 583. The nonuse or abandonment would then be measured by the acts of the company, which we note are not issues contained in this appeal before this Court.

¶35   We do not agree with Curry that the Water Court's interpretation of *Bailey* removes the beneficial use requirement for water rights developed under the Carey Land Act. Under *Bailey*, Pondera put to beneficial use water rights it perfected under the Carey Land Act by providing water for sale and issuing shares of stock up to its allowed acreage maximum as determined by the MCLB. Accordingly, the Water Court did not

19

err, and we therefore affirm the Water Court's decision that the Master incorrectly determined Pondera's rights were limited by the actual acreage irrigated by its shareholders.

¶36 *2. Did the Water Court err when it granted Pondera a "service area" rather than a place of use based on historically irrigated land?*

¶37 Curry contends the Water Court erred by misinterpreting *Bailey* to mean Pondera is entitled to a service area that is larger than any historic place of use. Curry also argues Pondera's rights, like any other water user's, are appurtenant to the land and therefore the Water Court erred by allowing Pondera a service area instead of a historical place of use.

¶38 Pondera argues that the service area is the appropriate boundary definition for Pondera's place of use. Further, Pondera contends that the use of a service area is consistent with DNRC guidelines, the Water Court's precedent, and Montana law's interpretation of a "public service corporation," as described in *Bailey*. Pondera argues its project is similar to an irrigation district, and because it uses no water itself and its sole purpose is to supply water to others, it should be entitled to claim a service area instead of a specific place of use.

¶39 In his report, the Water Master determined that a service area is the incorrect means of defining the boundary of where Pondera can put its water to use. Instead, the Master requested an accounting of the lands described on Pondera's stock certificates to determine the lands upon which the rights could be used. The Water Court disagreed with this analysis and found a service area properly embodies the intent and history of the project, and is allowed under Montana law.

### A.   Appurtenance

¶40    All parties discuss the issue of whether the water rights developed under the Carey Land Act should be appurtenant to the land where the water is put to ultimate use. In Montana the right to water is a usufructuary right. Thus, an appropriator has the right to use water but does not outright own the water. Mont. Const. art. IX, § 3(3); *Quigley*, 110 Mont. at 505, 103 P.2d at 1072. At various times the Montana legislature has enacted and then revised the statutory requirements for appropriators to follow in order to perfect water rights. In addition to the requirements involving beneficial use, a delineated place of use has historically been necessary for perfection, even prior to its necessity by statute. *Quigley*, 110 Mont. at 505, 103 P.2d at 1072.

¶41    The appurtenance of water to land is a general water rule in Montana.[5] *Smith v. Denniff*, 24 Mont. 20, 23-24, 60 P. 398, 399-400 (1900). Typically an appropriator applies appropriated water to his own land, thus unifying the water right and the title to the land. Other water-appropriating entities, such as irrigation districts, state water projects, and private corporations, also may own water rights, but at the same time it is possible they do not own the land upon which the water is put to use. These entities define the relationship between the water right owner and the water user in their organization's documents (i.e. bylaws, contracts, shares of stock, etc.).

¶42    In regard to water projects organized under the Carey Land Act, *Bruffey* summarized the purpose of appurtenance provisions found in the Carey Land Act's

---

[5] The current WUA requires the Water Court to state "the place of use and a description of the land, *if any*, to which the right is appurtenant" when issuing a final decree. Section 85-2-234(6)(e), MCA (2015) (emphasis added).

21

statutory language and operating companies' organizational documents, like the one found in Pondera's bylaws. In *Bruffey* we stated:

> [T]he purpose of making the water right appurtenant to the land and inseparable therefrom was to enable the construction company to retain an enforceable lien on both the land and water right, and that after the lien is satisfied the water right may be transferred to other lands with the same freedom that water rights generally may be transferred, so long as the rights of others are not adversely affected.

*Bruffey*, 137 Mont. at 345, 351 P.2d at 609. It was necessary to tie the water right to the land because under the statutory arrangement the construction company, which constructed the water infrastructure at the behest of the State, was to turn over the ownership of the system to the operating company upon completion of the system and at 90% sale of stock. *Valier Co.*, 123 Mont. at 332, 215 P.2d at 968. The construction company itself neither owned the land nor the water right but had considerable investment in the project by way of the hardware. Intertwining the water right and landownership in this way helped to ensure the construction company would receive payment for its role in the project.

¶43 Here, Pondera's stock provisions specifically contemplate the movement of water within the project's boundaries. Likewise, the specifics of the Carey Land Act support the idea of water movement. Further, as explained in *Bruffey*, the appurtenance of water was an important tool to help ensure the success of the project as a whole. The share of stock, once issued, ties the right to water to the land upon which the water is to be used as described in the certificate. However, an unissued or reclaimed share of stock still holds a measure of a perfected right to water, but will have no appurtenant attached land. Thus,

22

a strict requirement of appurtenance in this type of water right developed under the Carey Land Act cannot be followed.

¶44　Looking to the intent of the project under the Carey Land laws, the purpose of the arrangement was to bring water to the lands identified by the MCLB as irrigable within the project.　As described in the Master's report, one given share of stock may be attached to more land than one irrigable acre.　The landowner then would have the option of selecting which portion of his land to actually irrigate.　However, it is Pondera who remained the owner of the water right, not the landowner; the landowner is merely the conduit for beneficial use.　*Aberdeen-Springfield Canal Co.*, 982 P.2d at 921; *Twin Falls Salmon River Land & Water Co. v. Caldwell*, 266 U.S. 85, 45 S. Ct. 22 (1924).　Curry cites *Schwend* and *Adams v. Chilcott*, 182 Mont. 511, 597 P.2d 1140 (1979) for the proposition that water rights transfer with the sale of land.　While this proposition is correct, *Schwend* and *Adams* do not apply here.　In the event a landowner with stock in Pondera sells his land his water use-right via Pondera transfers to the new ownership, unless specifically reserved.　But, this does not mean the right is tied indelibly to the land itself; the right is tied to the issuance of stock by Pondera for use upon land as determined irrigable within the project.　The water right ownership and the land ownership remain distinct even if there is a substantial likelihood they will remain together.　If a shareholder fails to properly abide by his contractual payment obligations to Pondera for the continued use of the water right, then Pondera would be able to follow its corporate procedures to recall the share.　In this situation the water right would remain with the company, never with the shareholder even though the water itself is not being used at that

23

moment in time. Therefore, in a Carey-Land-Act context the individual stock certificates' appurtenant land should not define the overall water right's place of use.

## B. Service Area

¶45 We now turn to the issue, as the parties have framed it, of a service area as opposed to a historical place of use. At the outset we note, along with the Water Court, that the rights discussed herein in regard to the service area are those that Pondera acquired prior to the WUA. The rights acquired after the WUA are subject to use within their historic places of use. As previously stated, where water is put to use is an element of a water right. *Quigley*, 110 Mont. at 505, 103 P.2d at 1072. Under statute a statement of claim for an existing water right is prima facie proof of its contents. Section 85-2-227(1), MCA. This may be overcome if an objector proves, by a preponderance of the evidence, that the claim does not accurately reflect the water right as it existed prior to the WUA. *Nelson v. Brooks*, 2014 MT 120, ¶ 37, 375 Mont. 86, 329 P.3d 558 (quoting W. R. Adj. R. 19).

¶46 *Bailey* again is instructive in this discussion.

> There may be lands available for irrigation at the time the corporation's system is completed; but the corporation cannot compel people to utilize their lands, and, if they do, it cannot compel them to use its water. If the appropriation is not completed until the water is actually used, it is apparent at once that the corporation's right, if any it has, is so intangible and uncertain as to be of no value, whatever amount of money may have been expended on the work. If the land sought to be reclaimed should be government land, the corporation would be confronted with the additional difficulty that it cannot compel people to settle upon such lands, and its appropriation would depend upon the tide of immigration and the wishes of the settlers when they do come in, if use is necessary to complete the appropriation.

*Bailey*, 45 Mont. at 176, 122 P. at 583. While *Bailey* certainly does not contemplate removing all limitations to a water right secured under the Carey Land Act method, it highlights the need for prospectivity in such a development project. Over time the project was modified to adapt to a size in relation to the amount of water available as determined by the MCLB, amongst other factors. Similar to *Bailey* where the operating company acquired the rights of the original appropriators who sought to develop a distribution system, Pondera's predecessors likewise intended to distribute water for irrigation sale. Both in this case and in *Bailey* the water distribution companies ultimately availed themselves of the Carey Land Act, which is an explicit federal and state statutory construct to settle and bring water to arid land. The water rights developed in this manner were perfected upon the completion of the water distribution system, and thus deemed to satisfy the beneficial use requirement at that time. *Bailey*, 45 Mont. at 170-171, 122 P. at 580-581. This contrasts to a typical use or filed right where the beneficial use is the actual, in-fact use of the water.

¶47 As previously discussed, because beneficial use occurs prior to the application of the water on the land, the right cannot be constrained by the actual use of the water, nor can it be indelibly constrained by the exact land upon which the water is put to ultimate use. *Aberdeen-Springfield Canal Co.*, 982 P.2d at 922. The rights developed for future sale have their place of use determined by the lands irrigable under the system when it was completed. The prospectivity necessary in such a project, and recognized in *Bailey*, is still subject to limitations. While we recognize the intent of the specific statutory method of acquiring these water rights provides for flexibility, we concurrently recognize

25

they are still subject to principles of Montana water law. Water rights like these at issue may "be transferred to other lands with the same freedom that water rights generally may be transferred, so long as the rights of others are not adversely affected." *Bruffey*, 137 Mont. at 345, 351 P.2d at 609.

¶48 Based on the reasons outlined above, we therefore hold the idea of a service area is the proper method of satisfying the place-of-use requirement in the context of Carey Land Act projects. The boundaries of the service area are then subject to the project as it was developed and completed, and by the lands identified by the MCLB, as well as the fundamental tenets of water law in this state.

## C.    Boundaries of the Service Area

¶49 Because we agree with the court's determination that a service area is the appropriate method to define a place of use for a Carey Land Act project, we review its factual determination of the boundary for clear error. Pursuant to the Water Rights Claim Examination Rules, Pondera filed these claims on an irrigation district claim form. The record shows Pondera originally used Township and Range to describe its service area. In 2007, Pondera apparently sought to amend its service area to the 377,255.5-acre figure that Curry now contests.[6] The Water Court found that the project's boundaries have remained largely unchanged since its completion. The court further found the service area acreage amount as of 2007 was based on the DNRC's review of Pondera's claims. The court stated because it determined Pondera was entitled to claim a service area, and

---

[6] Initially Pondera claimed a service area of 377,813.5 acres. The DNRC reviewed Pondera's service area claim and was able to verify the currently-claimed number of 377,255.5 acres.

26

Curry was unable to produce evidence to refute the area's bounds, it accepted Pondera's service area of 377,255.5 acres. The court evaluated the evidence presented before it, and based on the substance of the evidence determined the acreage amount appropriately described the area of lands under the project. We hold the court did not commit clear error.

¶50 The Water Court stated in its order:

> The [c]ourt recognizes that the service area is large relative to the amount of historic irrigation within the service area. It is possible that a smaller service area could have been defined with better evidence. Given that this proceeding is a certification action and not a final determination of the water rights at issue, and given that claims and amendments thereto are afforded *prima facie* status by statute, the service area described in this order is sufficient to address the Water Court's obligations under § 85-2-406, MCA.

Similarly, while we agree a service area is the proper method of defining the place of use for the water rights developed under the Carey Land Act, we do not definitively determine the size of the service area in this Opinion and at this stage in the adjudication process. Merely, we agree with the Water Court that the 377,255.5 acres described as the service area will be sufficient for the purposes of its certification order, less our ruling below in regard to Issue three.

¶51 *3. Did the Water Court err by ruling Pondera's storage rights were beneficially used on the Birch Creek Flats prior to 1973?*

¶52 The Master found the water used on the Flats was non-Pondera water prior to the implementation of the WUA in 1973. The Master did note, however, at times Curry and other non-Pondera users would call upon Pondera to honor what they believed to be their senior water rights. The record indicates the parties have disputed the priority of their

27

rights, and for a long period of time essentially agreed to disagree as to seniority. However, Pondera would from time to time accommodate and respond to the non-Pondera water users irrigating on the Flats and release water from its storage facilities that would eventually flow into the canals utilized by the non-Pondera water users on the Flats. The Master found this release of water to the Flats did not amount to historical water use by Pondera in the area of the Flats, but instead was equivalent to the action of a junior water right holder responding to the call of a senior. According to the Master, such a response by Pondera maintained the status quo in the region and allowed the water users to irrigate relatively harmoniously.

¶53    Conversely, the Water Court found the evidence of the travel of some Pondera water to the Flats to indicate historic water use by Pondera on the Flats. It concluded the Flats should be considered within the bounds of the service area because the Flats can be reached by Pondera's system.

¶54    The Flats area is within the boundary of the service area as currently claimed by Pondera. Both the Water Court and the Master appear to evaluate the issue based on the acts of the irrigators on the Flats. Because we have determined beneficial use in the context of this case is decided not by the acts of the irrigators themselves but by the company through its issuance of shares, we must likewise evaluate the beneficial water use on the Flats by the acts of Pondera. Based on various testimonies it appears the water itself was discharged to irrigators on the Flats. However, it is clear that Pondera's definite water rights in the Flats area were acquired after July 1, 1973.

28

¶55    To exclude the Flats from the service area the prima facie status of Pondera's claim must be overcome by a preponderance of the evidence. Section 85-2-227(1), MCA. In the event the Flats were originally included in the project Pondera can nonetheless lose its right to the area due to nonuse or abandonment. *Bailey*, 45 Mont. at 178, 122 P. at 583. While the Master anchored his analysis in the irrigators' beneficial water use, which we reject, we agree with his general outline of the evidence in regard to Pondera's interaction with users on the Flats, as presented at this stage in the adjudication process. In regard to the Flats, the Master found the evidence supported the following findings: "all of the water use on the Flats before 1973 was non-[Pondera]"; Pondera "accommodated its neighbors, at times . . . effectively honoring their senior rights"; and as quoted from an MCLB report "[Pondera] was 'inclined to satisfy [non-shareholder water users] in every way possible to prevent controversies over these rights.'" Further, a report generated by Pondera's predecessor stated the Flats were actually not included in the project.

¶56    To summarize, while there is some evidence of water use by irrigators on the Flats, there is more evidence to support that the Flats were either not included in the project or Pondera's lack of issuance of stock to water users on the Flats prior to 1973 equates to nonuse in the area. We cannot agree that the Water Court's legal conclusion that water was beneficially used on the Flats prior to 1973 is correct. Instead, we find Curry met his burden of proof. Therefore, the Water Court's order regarding the inclusion of the Flats in the service area is reversed. We remand to the court to remove

29

the inclusion of the Flats from the service area and to retabulate the bounds of the service area to the extent the removal of the Flats affects the acreage assessment.

¶57 *4. Did the Water Court err by substituting its judgment for the trier of fact in regard to Claim Nos. 41M 162000-00 and 41M 162109-00 (Gray Right), and Claim No. 41M 199797-00?*

¶58 Curry argues the Water Court erroneously substituted its judgment for the trier of fact, the Water Master, when it increased the flow rate of the Gray Right from 0.95 cubic feet per second (cfs) to 5.67 cfs. Curry claims there is substantial evidence to support the Master's finding in regard to the Gray Right. Curry also argues the court erred when it reversed the Master's dismissal of Claim No. 41M 199797-00 because the Master found the right to be a duplicate of another right claim. Curry contends the court contradicted its determination that Claim No. 41M 199797-00 should be reinstated when during its analysis of other claims it found the right to be duplicative. In response to the Gray Right, Pondera argues the Master's report contained contradictory findings regarding the flow rates for the rights. It contends the court properly evaluated the flow rate based on ditch capacity measurements.

¶59 A water right's flow rate is a factual determination. *Worden v. Alexander*, 108 Mont. 208, 213, 90 P.2d 160, 162 (1939) (quoting *Tucker v. Missoula Light & Water Co.*, 77 Mont. 91, 108, 250 P. 11, 18 (1926)). The Master made a flow rate finding that was subsequently reversed by the court. We first review de novo whether the court correctly applied the appropriate standard of review. *Heavirland*, ¶ 15. Again, the Water Court is obliged to review the Master's determination to see whether there is substantial evidence to support the factual findings. If there is substantial evidence the court may still

30

determine the Master was in error if he misapprehended the effect of the evidence. Finally, even if there is substantial evidence and no misapprehension of the evidence, the court may still find clear error if upon viewing the evidence as a whole the court has a firm and definite opinion that a mistake has been made. *Skelton Ranch, Inc.*, ¶ 27. We address the arguments in the order Curry has raised them.

### A. Gray Right

¶60 Both the Master and the court effectively relied on the same report (the Atwood Report) as evidence to support their respective flow rate determinations. The Atwood Report made conflicting statements regarding the flow rate for this right. The Master found the flow rate to be 0.95 cfs based on the duty of water at the time, which is both a common water law assumption, and is also used in the Atwood Report in reference to this right. The court disagreed and stated the Gray Right, which was originally claimed as 12.5 cfs in the notice of appropriation, should be based on the ditch capacity of 5.67 cfs, which is also stated in the Atwood Report in reference to this right.

¶61 Curry argues first there is substantial evidence to support the Master's findings, and second the court does not appropriately apply the applicable standard of review because it does not state whether substantial evidence supports the Master's finding. While it would certainly be useful for the court to use the exact terminology found in the applicable standard of review, the court indeed discussed the substance of the Master's findings regarding the Gray Right. The court indicated that while the Master's determination that the evidence showed a flow rate of 0.95 cfs, the Master misapprehended the effect of this evidence. Specifically, the Court stated it was

31

"concerned about the use of a duty of water equivalent to one cfs for 80 acres" for this right. It further looked at the evidence regarding the general duty 0.95 cfs and ditch capacity 5.67 cfs, and found, in light of the latter's accuracy and relationship to this specific right, ditch capacity more appropriately depicted the extent of the Gray Right. Again, while the court could have more clearly stated its rationale for overturning the Master's decision, we hold it did in fact apply the appropriate standard of review.

¶62 Next, we turn to the court's determination of 5.67 cfs. This substitute finding we review under the clearly erroneous standard. *Skelton Ranch, Inc.*, ¶ 26. The evidence available regarding this right, the Atwood Report, makes two competing statements regarding the flow rate. Again, it states the ditch capacity was identified as 5.67 cfs at the time of the ditch's completion. Yet also, it states the duty of water at that time was one cfs for 80 irrigable acres, a standard water assumption. Thus, based on the 76 irrigable acres under the right, the Atwood Report assumes a 0.95 cfs flow rate to further analyze the right. It does not, however, definitively note that 0.95 cfs was in fact used to irrigate. Further, as the court notes, ditch capacity, when it is available to be determined, is preferable to the standardized duty of water assumption. *See McDonald*, 220 Mont. 519, 722 P.2d 598. Therefore, based on the substance of the evidence regarding this right and in light of the evidence as a whole, we hold the court's finding of 5.67 cfs for the Gray Right is not clearly erroneous.

### B. Claim No. 41M 199797-00

¶63 The court's finding that Claim No. 41M 199797-00 should not be dismissed because it was not duplicative is a legal conclusion that we review for correctness.

*Heavirland*, ¶ 14; s*ee also State v. Todd*, 262 Mont. 108, 112, 863 P.2d 423, 425 (1993). The court properly set forth that a water claim is prima facie proof of its contents. Section 85-2-227(1), MCA. To overcome the prima facie proof, the burden of proof is upon the challenger to produce enough contrary evidence to meet the evidentiary standard of a preponderance of the evidence. *Marks*, ¶ 15. The court found the challenger, Curry, did not meet this burden of proof and the Master's determination was not supported, thus the claim should not be dismissed. Upon review of the record, we agree with the court's conclusion. Therefore, we affirm its decision to reverse the Master's dismissal and reinstate Claim No. 41M 199797-00.

¶64    *5. Should the Water Court's tabulation for Claim Nos. 41M 131103-00 (Curry claim) and 41M 199796-00 (Pondera claim) include volume measurements?*

¶65    Pondera contends on cross-appeal that the tabulations for the Curry and Pondera claims should both include volume measurements. Pondera argues a volume determination would "greatly assist in the proper administration of water on Birch Creek by the district court and significantly lessen the chances of ongoing distribution disputes."

¶66    In regard to volume determinations the WUA states, in part, a final decree must state the "flow rate and volume for rights that a water judge determines require both volume and flow rate to adequately administer the right." Section 85-2-234(6)(b)(iii), MCA. The decision by the Water Court to limit a water right by volume is a matter of discretion. Section 85-2-234(6)(b), MCA. While we recognize a volume determination may potentially be helpful to Pondera and the ultimate administration of these rights, we

33

are aware of no Montana law, and Pondera has not provided us with any, that requires the Water Court to make a volume determination for these rights. Such a determination is in the purview of the Water Court and we will not substitute our judgment for the court's judgment when it is not required by law. Therefore, the Water Court's tabulation of these Curry and Pondera claims without a volume determination is affirmed.

## CONCLUSION

¶67 In summary, we affirm the Water Court's conclusion that Pondera's rights are not limited by the shareholders' actual historical acreage irrigated. We further affirm the Water Court's conclusion that Pondera is entitled to a service area. However, we hold the Water Court erred when it determined the acreage included in the service area and we remand this issue to the court for further proceedings in accord with the discussion and decision under Issue 3.

¶68 With respect to Curry's appeal and Pondera's cross-appeal regarding the specific water rights, Issues 4 and 5, we hold the Water Court did not err in its determinations.

¶69 Affirmed in part; reversed in part; and remanded to the Water Court for further proceedings consistent with this Opinion.

/S/ MICHAEL E WHEAT

We Concur:
/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

34

Justice Beth Baker, specially concurring.

¶70    I concur in the Court's decision and write separately to emphasize several points.

¶71    I agree with the Court's application of *Bailey* in holding that Pondera's water rights are not measured by the stockholders' actual historic water use. *Bailey* makes clear that a public service corporation's water rights are limited by beneficial use—as are all water rights in Montana. *Bailey*, 45 Mont. at 178, 122 P. at 583 (concluding that a public service corporation "must have an intention to apply the water to a useful and beneficial purpose"). *Bailey* clarifies further that a public service corporation's beneficial use is not measured by the acts of the shareholders, but rather, by the acts of the public service corporation. *Bailey*, 45 Mont. at 178, 122 P. at 583 (concluding that a public service corporation's water right "cannot be made to depend for its existence in the first instance upon the voluntary acts of third parties").

¶72    *Bailey* held unequivocally that, by express language in Montana's constitution, appropriating water for sale is a beneficial use. *Bailey*, 45 Mont. at 175, 122 P. at 582. This principle remains true under the 1972 Constitution. Mont. Const. art IX, § 3. Provided that Pondera had a bona fide intention "to apply the water to a useful or beneficial purpose," its appropriation was *complete* when it "fully complied with the statute and ha[d] its distributing system completed[, was] ready and willing to deliver water to users upon demand, and offer[ed] to do so." *Bailey*, 45 Mont. at 177-78, 122 P. at 583. Unlike in *Toohey v. Campbell*, 24 Mont. 13, 18, 60 P. 396, 397 (1900), where the squatter Flannery did not show intent, and "could not possibly" have intended, to use water upon a larger area than the portion he actually cultivated, the state engineer's report

35

and Carey Land Board's approval of the project are sufficient evidence of Pondera's bona fide intention to support the Water Court's decision to cap Pondera's irrigated acreage at 72,000.

¶73 As the Water Court acknowledged and this Court points out, however, a water service entity's right may be lost by nonuse or abandonment. Opinion, ¶ 34; *Bailey*, 45 Mont. at 178, 122 P. at 583. The Water Master recognized in his report, "The parties did not raise or brief the partial abandonment issue that 34 years of non-use of several thousand acre-feet suggests, along with possible late-priority use rights, but it could become an issue when Basin 41M is adjudicated." That Pondera continues to provide water for sale by offering its shares of stock does not foreclose Curry or other objectors from attempting to show in the adjudication process that Pondera has lost its priority to sufficient water for irrigating 72,000 acres. At that point, evidence of the amount of water actually applied to irrigation certainly will be relevant. There also may be relevant evidence, not before us in this record, regarding how Pondera's issued stock represents water it actually sold. But the Water Court correctly applied the law when it concluded that the actual historical use by irrigators was not the measure of Pondera's right in the first instance. *Bailey*, 45 Mont. at 177, 122 P. at 583 (recognizing "the right of a public service corporation to make an appropriation independently of its present or future customers, and to have a definite time fixed at which its right attaches").

¶74 The same principles hold true for defining the limits of Pondera's service area. The Court properly declines to define the boundaries and size of the service area "in this Opinion and at this stage in the adjudication process." Opinion, ¶ 50. Its conclusion that

36

the service area should be determined in part by "the project as it was developed and completed, and by the lands identified by the MCLB," does not foreclose further arguments in the adjudication process concerning the size of Pondera's place of use, or service area.

¶75 The evidence demonstrates that the Carey Land Board based its determination of the project's boundaries on the "lands available for irrigation at the time the corporation's system [was] completed." *Bailey*, 45 Mont. at 176, 122 P. at 583. The Board's determination, however, does not consider whether Pondera lost its right through "abandonment or nonuser for an unreasonable length of time." *Bailey*, 45 Mont. at 178, 122 P. at 583. Furthermore, it is

> indisputable that a water user who has been decreed the right to use a certain [amount] of water upon lands for which a beneficial use has been proven, cannot subsequently extend the use of that water to additional lands not under actual or contemplated irrigation at the time the right was decreed, to the injury of subsequent appropriators.

*Quigley v. McIntosh*, 110 Mont. 495, 505, 102 P.2d 1067, 1072 (1940). Although *Quigley* did not involve a public service corporation, the underlying principle that "place of diversion, or place or purpose of use, may be changed only 'if others are not thereby injured,'" *Quigley*, 110 Mont. at 505, 102 P.2d at 1072 (quoting sec. 7095, RCM (1935)), applies to all appropriators. The Court's holding on the Birch Creek Flats issue, Opinion, ¶¶ 54-55, reflects a similar rationale.

/S/ BETH BAKER

37

Justice Jim Rice and Justice Patricia O. Cotter join in the concurring Opinion of Justice Baker.

/S/ JIM RICE
/S/ PATRICIA COTTER

Justice Laurie McKinnon, dissenting.

¶76 I respectfully dissent from the Court's opinion. I would reverse the Water Court's opinion regarding Pondera's annual irrigation and place of use. I would affirm the Water Master's finding limiting Pondera's annual irrigation to 56,556 acres. I would affirm the Water Master's finding limiting Pondera's place of use to the approximately 85,000 acres described on the share certificates. I would reinstate the Water Master's order requiring Pondera to comply with Curry's discovery request to produce the share certificates.

I.

¶77 The standard adage teaches us that "hard cases make bad law." *Northern Securities Co. v. United States*, 193 U.S. 197, 364 (1904) (Holmes, J., dissenting). Today the Court reinforces the adage. Several issues make this case quite difficult to discuss and decide with any amount of clarity. First, the parties litigated this case—regarding Pondera's annual irrigation and place of use—as if Pondera has a single appropriation. As a consequence, the Water Master and the Water Court both analyze Pondera's water rights in the collective regarding these two issues. We are now forced to do the same. The problem with this methodology is that the rules of water law were intended to deal with individual appropriations and do not lend themselves to limiting appropriations as a

whole, particularly with a public service corporation where the original intent of *each* of the individual appropriators is of the utmost importance.

¶78 Second, the Water Court uses the term "service area" as if it is a term of art and fails to provide an actual definition for the term. Service area is not a recognizable term in Montana law or western water law and does not have a specific definition. Because the Water Court fails to define the term, it is inherently challenging to determine whether Pondera is entitled to a "service area" and even more challenging to define the limits.[1]

¶79 Third, both Curry and Pondera misread this Court's seminal decision in *Bailey*. On one hand, Curry maintains that under *Bailey*—even for a public service corporation—actual beneficial use is a necessary prerequisite to a completed appropriation and an appropriator cannot obtain an appropriation of water in an amount greater than actual beneficial use. However, in *Bailey*, the public service corporation was permitted a water right in the amount of 2,200 miner's inches despite only actually beneficially using 1,430 miner's inches. Pondera, on the other hand, contends that *Bailey* recognizes that offering water for sale is a beneficial use for a public service corporation. *Bailey* cannot be read to stand for such a proposition. Such a view, if adopted, would fundamentally alter Montana water law, leading to unchecked speculation without any requirement that water be actually used. As explained more fully below, *Bailey* does not recognize that offering

---

[1] The term is an engineering term, not a water law term. Because the term merely adds confusion, I would suggest not adding it to this Court's lexicon. It is not as if we need to create a new term because Pondera does not have a place of use. Both the Water Master and the Water Court agree Pondera has a place of use. The Water Master found Pondera's place of use to be an approximately 85,000 acre area and the Water Court found it to be an approximately 377,000 acre area.

water for sale is a beneficial use. Instead, *Bailey* adopts principles consistent with the so-called "growing communities" doctrine wherein a water right may be perfected based on *future* beneficial use, rather than *actual* beneficial use. Thus, neither party has advanced an interpretation of *Bailey* which assists in resolving the particular issues here and which maintains the integrity of certain basic principles of western water law and water law long recognized in this State.

¶80 Fourth, in addition to delineating a place of use, the Water Court and the Water Master both place an annual acreage limitation on Pondera's water rights. The elements of an appropriative water right are: (1) quantity of water, typically expressed in flow rate (cubic feet per second) and/or volume (acre-feet); (2) place of use (total acreage); (3) period of use (months, days); (4) point of diversion (legal description); (5) purpose of use (e.g., irrigation, domestic, culinary use, commercial use, or otherwise); and (6) priority date of the appropriation (date). An annual acreage limitation does not fit into any of these categories. While annual acres irrigated is a necessary component in determining flow rate, volume, and place of use, the parties do not offer any authority to support incorporation of an annual acreage limit as an express element of an appropriative water right. Nor do the parties explain why the Water Master and the Water Court did so in this case.[2]

---

[2] The Water Master was concerned with Pondera's total volume. And, in addition to the express limitation on annual irrigation, the Master used Pondera's annual irrigation to limit volume, concluding that Pondera's volume is limited to the "amount needed to provide 1.5 af/acre for 56,556 irrigated acres plus a reasonable amount for transportation and evaporation losses of 30%." The Water Court's opinion does not appear to contain a similar volume limitation. It is unclear whether the volume limitation now exists on Pondera's water rights. I will discuss the

40

¶81 Fifth, the Water Court removed jurisdiction of this case from the Water Master prior to the Master finishing its proceedings. While the Water Master issued a report with findings of fact and conclusions of law, the Water Master stayed its final determination until Pondera produced the share certificates pursuant to Curry's discovery request. As a result, the Water Master did not complete a tabulation of Pondera's water rights and its final conclusions are necessarily incomplete. We are thus left to guess regarding the Master's final disposition of Pondera's water rights.

¶82 Lastly, the Water Court fails to articulate the standard of review it used to consider and ultimately reverse the Water Master regarding the two most salient issues on appeal: the annual acreage limitation and place of use. Although the Water Court carefully and prudently reviewed other issues in the Water Master's report, with respect to these two issues, there is noticeably absent any language in the Water Court's opinion indicating whether the Water Master clearly erred in making a certain finding of fact, misapprehended the effect of certain evidence, or otherwise misapplied applicable law. The most that can be gleaned from the Water Court's opinion is that the Water Court appears to conclude that the Water Master erred by failing to grant Pondera a "service area," while nonetheless concluding that the "Master's decision amounted to creation of a service area." Thus, rather than having the benefit of another court's review prior to our own, we are essentially left with two standalone opinions.

---

annual limitation as if it is a basis to limit volume—though it is unclear if that is why the parties dispute the annual acreage or if the parties merely dispute the annual acreage as an independent element of the water rights.

## II.

¶83 Given the aforementioned difficulties, I will nevertheless endeavor to set forth why the principles the Court announces here today cannot withstand scrutiny and will ultimately be proven unsound in future cases. I offer my analysis with the hope that when these principles are revisited—which I believe to be certain—parties may brief their arguments accordingly.

¶84 Our decision in *Bailey* enunciates most of the applicable law in determining the extent of Pondera's water rights. Read without context, *Bailey* is a difficult case to decipher. However, read in the broader context of background principles of western water law, *Bailey* is a straightforward decision. In *Bailey*, this Court broke from traditional principles of water law—requiring actual beneficial use to perfect a water right—and adopted principles consistent with the so-called "growing communities" doctrine. The growing communities doctrine is an infrequently invoked exception to the common law requirement of actual beneficial use for perfection of a water right, which permits appropriators—typically only municipalities—to perfect a water right based on *anticipated future* or *contemplated* beneficial use.

¶85 Before addressing the issues on appeal, I will address the governing law by: first, laying out traditional principles of the prior appropriation doctrine; second, discussing the limited exception to those principles, i.e., the growing communities doctrine; and finally, discussing *Bailey*.

*Traditional Water Law:*
*The Requirement of Actual Beneficial Use and a Completed Appropriation*

¶86    Fundamental to water law in the west is the principle that "*beneficial use* shall be the *basis*, the *measure* and the *limit* of all rights to the use of water." *McDonald v. State*, 220 Mont. 519, 530, 722 P.2d 598, 605 (1986) (emphasis in original). "State constitutions, statutes, and judicial decisions throughout the western states recognize the concept." A. Dan Tarlock, et al., eds., *Water Resource Management: A Casebook in Law & Public Policy* 195 (4th ed. 1993).

¶87    Equally important to the prior appropriation doctrine is the principle that "application of water to beneficial use is essential to a completed appropriation." *State ex rel. State Eng'r v. Crider*, 78 N.M. 312, 315, 431 P.2d 45, 48 (1967). "Judicial opinions and scholarly commentators have repeatedly stated the rule that application to a beneficial use is the touchstone of the appropriation doctrine." *In re Adjudication of Existing Rights to the Use of all Water*, 2002 MT 216, ¶ 10, 311 Mont. 327, 55 P.3d 396. In Montana, like all other western states, to complete a valid appropriation an appropriator must: (1) demonstrate a bona fide intention to apply the water to some existing or contemplated beneficial purpose, and (2) *actually beneficially apply* the water to the intended lands. *Toohey v. Campbell*, 24 Mont. 13, 14, 60 P. 396, 396 (1900); *In re Adjudication of Existing Rights to the Use of all Water*, ¶ 10 ("the true test of appropriation of water is the successful application thereof to the beneficial use designed"). Both elements need not occur simultaneously. Rather, an appropriator is permitted a reasonable amount of time to actually apply the water to the intended lands. *McDonald*, 220 Mont. at 529, 722 P.2d at 604. However, until the appropriator perfects his water right by actual use, the appropriator holds only an "inchoate right" to the

water.[3] *Mont. Dep't of Natural Res. & Conservation v. Intake Water Co.*, 171 Mont. 416, 436, 558 P.2d 1110, 1121 (1976). Thus, the ultimate "application of the water to the intended beneficial use is the final step taken by the appropriator in acquiring an appropriative right" and the "[a]pplication of the water to such use is *absolutely essential* to acquisition of the right." 1 Wells A. Hutchins, *Water Rights Laws in the Nineteen Western States* 442 (1971) (hereinafter, Hutchins) (emphasis added).

¶88    As a necessary corollary, the extent of the appropriation is measured by: (1) the appropriator's bona fide intent at the time of the appropriation, and (2) the appropriator's actual beneficial use at the time of perfection. *Jacobs v. Harlowton*, 66 Mont. 312, 320, 213 P. 244, 246 (1923). In turn, actual beneficial use is limited by: (1) the needs of the appropriator and (2) the capacity of the diversion. *Skelton Ranch, Inc. v. Pondera Cty. Canal & Reservoir Co.*, 2014 MT 167, ¶ 55, 375 Mont. 327, 328 P.3d 644. "If an appropriator's needs exceed the capacity of his means of diversion . . . then the capacity of the diversion measures the extent of his water right." *Skelton Ranch*, ¶ 55. Accordingly, an appropriator's water right is measured by the lesser of the following: (1) the appropriator's bona fide intent at the time of the appropriation; (2) the actual needs of the appropriator at the time of perfection; and (3) the capacity of the diversion at the time of perfection.[4]

---

[3] An inchoate water right is "an incomplete appropriative right in good standing." Hutchins, 226.

[4] In *McDonald*, this Court expressly recognized that these principles are enshrined in the Montana Constitution, stating:

*Growing Communities Doctrine:*
*The Exception from Actual Beneficial Use and the Reservation of Water for Future Needs*

¶89    "Municipalities occupy a unique place in the water appropriation philosophy of the West."  Hutchins, 245.  As western municipalities grew both in number and in population, "it became the accepted practice to give them special treatment in appropriating water for the service of their inhabitants."  Hutchins, 246.  The growing communities doctrine affords municipalities such special treatment by breaking from the fundamental rule of the prior appropriation doctrine requiring prior actual beneficial use.  As such, the doctrine is generally "characterized as a subset of the prior appropriation doctrine."  Janis E. Carpenter, *Symposium on Northwest Water Law: Water for Growing Communities: Refining Tradition in the Pacific Northwest*, 27 Envtl. L. 127, 134-35 (1997) (hereinafter, Carpenter, *Symposium on Northwest Water Law*).

¶90    Under the growing communities doctrine, the traditional requirement of actual beneficial use is relaxed, permitting "cities to perfect a water right to the amount of water

---

The foregoing cases and many others serve to illustrate that what is preserved to owners of appropriated or decreed water rights by the provision of the 1972 Constitution is what the law has always contemplated in this state as the extent of a water right: such amount of water as, by pattern of use and means of use, the owners or their predecessors put to beneficial use.  Thus an owner may have a decreed right to a certain number of miner's inches of water; or a statutory appropriative right to a stated amount; or a right depending upon mere use; or even a prescriptive right to a stated amount; nonetheless, the Water Use Act contemplates that all water rights, regardless of prior statements or claims as to amount, must nevertheless, to be recognized, pass the test of historical, unabandoned beneficial use. . . . To that extent only the 1972 constitutional recognition of water rights is effective and will be sustained.

*McDonald*, 220 Mont. at 529, 722 P.2d at 604.

that they will need to meet reasonably anticipated future growth." A. Dan Tarlock, *Law of Water Rights and Resources* § 5:71 (2015) (hereinafter, Tarlock). The theory of the "doctrine reflects a concept of *constructive* beneficial use because it includes an amount of probable future municipal use, as well as actual use." *Dep't of Ecology v. Theodoratus*, 135 Wash. 2d 582, 615, 957 P.2d 1241, 1257 (1998) (Sanders, J., dissenting) (quoting Carpenter, *Symposium on Northwest Water Law*, 27 Envtl. L. at 136) (internal quotation marks omitted) (emphasis added).

¶91 The growing communities doctrine is generally recognized throughout the western states. *See State ex rel. Reynolds v. Rio Rancho Estates, Inc.*, 95 N.M. 560, 564, 624 P.2d 502, 506 (1981) ("When determining the extent of a municipal water right, it is appropriate for the court to look to a city's planned *future use* of water from the well caused by an increasing population."); *City & Cnty. of Denver v. Northern Colo. Water Conservancy Dist.*, 130 Colo. 375, 384, 276 P.2d 992, 997 (1954) ("when appropriations are sought by a growing city, regard should be given to its *reasonably anticipated* requirements."); Hutchins, 246-49 (discussing the growing communities doctrine and the various ways different states allow municipalities to "appropriate water for *contemplated future reasonable* needs") (emphasis added). The Montana Legislature has codified the growing communities doctrine in § 85-2-316, MCA, which provides, in part: "The state, any political subdivision or agency of the state . . . may apply to the department to

acquire a state water reservation for existing or *future beneficial uses . . . .*" (Emphasis added.)[5]

¶92 However, the "doctrine is not without limits." Tarlock, § 5:71. An appropriation under the doctrine is limited in the same way as a traditional appropriation, with the exception of a relaxed allowance for anticipated needs. Under the doctrine, an appropriation is measured by the lesser of: (1) the appropriator's bona fide intent at the time of the appropriation; (2) the reasonably anticipated needs (rather than the actual needs); and (3) the capacity of the diversion. *Pagosa Area Water & Sanitation Dist. v. Trout Unlimited (In re Application for Water Rights)*, 170 P.3d 307, 314-17 (Colo. 2007);[6] *Theodoratus*, 135 Wash. 2d at 609-10, 957 P.2d at 1254 (Sanders, J., dissenting).

¶93 Additionally, unlike traditional appropriations, courts impose a condition subsequent on the right, requiring that the "water must be actually applied to beneficial use within a reasonable period of time." Tarlock, 5:71. If the appropriator fails to apply the water right to actual beneficial use within a reasonable period, the water right is lost. Tarlock, 5:71. *See also Crider*, 78 N.M. at 316, 431 P.2d at 49 ("We add, however, that

---

[5] The Department of Natural Resources and Conservation is required to review an appropriator's reservation every ten years under the statute to determine whether the objectives of the reservation are still being served. All parties agree that Pondera cannot avail itself of § 85-2-316, MCA, because it is not a state entity.

[6] Colorado deals with future water appropriations through the use of "conditional" water rights. Although I discuss a water right acquired under the doctrine as if it is a completed or a perfected water right, I also explain below that a "condition subsequent" is imposed on the right— requiring that it be put to beneficial use within a reasonable time—which arguably makes the water right a conditional right. Based on the legal issues presented and the facts of this case, it is inconsequential what a right acquired under the doctrine is labeled. Thus, though I speak of a right acquired under the doctrine as a completed or perfected water right, I leave open the possibility that the right may be better characterized in future cases as a conditional water right.

the cities' rights to the appropriation of water for future use is subject to the condition that the needed water be applied to beneficial use within a reasonable time. If not so applied such right may be lost.").

¶94 The growing communities doctrine thus seeks to establish a balance between preserving use of water for actual use and the need for development in the arid west. Nonetheless, the "doctrine clearly conflicts with the basic common law tenet of prior beneficial use and can only be viewed as an exception." Darryl V. Wareham, *Washington Water Rights Based on Actual Use or on Delivery System Capacity? Department of Ecology v. Theodoratus*, 24 Seattle Univ. L. R. 187, 205 (2000). Consequently, the growing communities doctrine typically applies only to municipalities. Hutchins, 382 (explaining that, to the best of the author's knowledge, applying the doctrine outside of municipalities has "[n]ever . . . been sanctioned by any high court in the West."); *but see Theodoratus*, 135 Wash. 2d at 617, 957 P.2d at 1258 (Sanders, J., dissenting) (contending that the "doctrine is equally applicable to private developments."). Because the doctrine breaks from bedrock principles of actual beneficial use, an appropriator's attempt to perfect a water right in an amount for future beneficial use is often met with both skepticism and resistance from courts. *See, e.g.*, *Pagosa Area Water & Sanitation Dist.*, 170 P.3d at 317 (explaining that the "water court should closely scrutinize a governmental agency's claim" for future beneficial use).

*Bailey*

¶95    In *Bailey*, this Court adopted the principles of the growing communities doctrine for a public service corporation.  Aside from extending the doctrine outside the applicability of only municipalities, *Bailey* is typical in its understanding of the doctrine.

¶96    In *Bailey*, a public service corporation sought to perfect a water right larger than the amount the corporation had put to beneficial use, attempting to perfect a water right in the amount of 2,200 miner's inches when the company had only ever sold 1,430 miner's inches for beneficial use.  *Bailey*, 45 Mont. at 162, 122 P. at 577.  In accordance with traditional prior appropriation principles, the objectors maintained that the company's appropriation should be limited by actual beneficial use to 1,430 miner's inches.  *Bailey*, 45 Mont. at 160, 122 P. at 576.

¶97    This Court disagreed.  We addressed the following issues: (1) whether an appropriator could perfect a water right for future or contemplated beneficial use; (2) when such a right is perfected for a public service corporation; and (3) the measure and extent of a perfected right that is based on future or contemplated beneficial use. *Bailey*, 45 Mont. at 166, 122 P. at 579.

¶98    Before reaching our conclusion on the issues, we discussed the parties' varying views on whether actual beneficial use is necessary to perfect a water right for a public service corporation.  We explained that under the corporation's "theory thus advanced, the claimant who proceeds under the statute, and performs the acts required as set forth [in the statute], *has a completed appropriation* of water upon the completion of the work on his ditch, canal, or other means of diversion, *even before the water is actually applied to a beneficial use*."  *Bailey*, 45 Mont. at 174, 122 P. at 582 (emphasis added).  We

49

contrasted this view with the traditional principles advanced by the objectors wherein "it is held that *actual application* of the water to a beneficial use is a *necessary prerequisite* of a completed appropriation." *Bailey*, 45 Mont. at 174, 122 P. at 582 (emphasis added). We rejected the latter view "as to a public service corporation" because the "public policy of this state [is] to encourage these public service corporations" to develop the arid regions and corporations would be unwilling to do so without the certainty of a completed appropriation. *Bailey*, 45 Mont. at 177, 122 P. at 583.

¶99     We made the following holdings.  First, we agreed with the corporation that it could perfect a water right based on future beneficial use, explaining that, while the statute requires "beneficial use," the beneficial use "may be prospective or contemplated." *Bailey*, 45 Mont. at 175, 122 P. at 582.  Second, we held that "as to a public service corporation, its appropriation is complete when it has fully complied with the statute and has its distributing system completed and is ready and willing to deliver water to users upon demand, and offers to do so." *Bailey*, 45 Mont. at 177-78, 122 P. at 583.  Lastly, we concluded that the extent of the appropriation is limited by: (1) the corporation's "bona fide intention at the time" the appropriation is made; (2) the corporation's reasonably anticipated "needs"; and (3) the "capacity" of the corporation's diversion. *Bailey*, 45 Mont. at 178-79, 122 P. at 583-84.  We further imposed a condition subsequent on the right, concluding that the right may be lost by "nonuser for an unreasonable length of time." *Bailey*, 45 Mont. at 179, 122 P. at 584.

¶100 Therefore, *Bailey* expressly acknowledged that actual beneficial use is not required for a public service corporation to complete an appropriation of water and made

50

clear that a public service corporation may perfect a water right based upon anticipated future beneficial use. *Bailey* also made clear that a right perfected based upon anticipated future beneficial use is not without limits, expressly imposing a requirement that the water, within a reasonable length of time, be put to actual beneficial use. In doing so, *Bailey* embraced principles inherent in the growing communities doctrine and balanced the preservation of water for actual use with the need for development in the arid west.

### III.

¶101 Having developed the applicable law and explained *Bailey* in the context of the broader principles of water law, I will address the issues presented by the instant appeal.

*(1) Whether the Water Court correctly concluded that the Water Master clearly erred in finding that Pondera's water rights are limited to an annual irrigation of 56,556 acres.*

¶102 Curry argues that the Water Court erred in reversing the Water Master's finding that limits Pondera's annual irrigation to 56,556 acres. He maintains that Pondera's water rights should be "limited by the extent of historic[al] beneficial use" and the "maximum extent of Pondera's beneficial use of water is for the irrigation of 56,556 acres."

¶103 Pondera appears to agree with Curry that its annual irrigation is limited by historical beneficial use, but disagrees with Curry over the meaning of beneficial use. Pondera maintains that it has historically put 72,000 acres per year to beneficial use by issuing its shares of stock. Relying on *Bailey* and the Montana Constitution, Pondera reasons that its ready availability of the water for sale to the irrigators is a beneficial use.

51

¶104 We initially review the Water Court's order de novo. *Skelton Ranch*, ¶ 26. Our de novo review begins by determining whether the Water Master's findings are clearly erroneous. *Skelton Ranch*, ¶ 38. "The Water Court does not have unfettered discretion in reviewing a master's findings." *Skelton Ranch*, ¶ 69 (Baker, J., concurring in part and dissenting in part). "Differences of opinion or interpretation regarding evidentiary issues cannot constitute clear error." *Skelton Ranch*, ¶ 69 (Baker, J., concurring in part and dissenting in part). Rather, "[s]tated more colorfully, a clearly erroneous finding of fact must strike the reviewing court as wrong 'with the force of a five-week-old, unrefrigerated dead fish.'" *Skelton Ranch*, ¶ 69 (Baker, J., concurring in part and dissenting in part) (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)).

¶105 I agree with Curry that the Water Master did not clearly err by limiting Pondera's water rights based on Pondera's historical beneficial use. In the case of a public service corporation,[7] a valid appropriation is limited by: (1) the appropriator's bona fide intention at the time the appropriate is made; (2) the appropriator's reasonably anticipated needs; and (3) the capacity of the appropriator's infrastructure.[8] *Bailey*, 45 Mont. at 178-79, 122 P. at 583-84.

> (a) *Bona fide intent*

---

[7] Curry does not dispute that Pondera is a public service corporation within the meaning of *Bailey*.

[8] I do not address the capacity limitation below. It is unclear from the record the extent of Pondera's system.

¶106 This Court has "long recognized the importance of an appropriator's intent at the time of appropriation." *Teton Co-Op Canal Co. v. Teton Coop Reservoir Co.*, 2015 MT 344, ¶ 33, 382 Mont. 1, __ P.3d __. An appropriator's "intent at the time of appropriation must be determined by his act[s] and by surrounding circumstances, its actual and contemplated use, and the purpose thereof." *Wheat v. Cameron*, 64 Mont. 494, 501, 210 P. 761, 763 (1922). An appropriator's bona fide intent must be objectively reasonable and "not mere expressions of hope or desire reflecting a 'gleam-in-the-eye philosophy' regarding future use of the water." *In re Adjudication of the Existing Rights Within the Clark Fork River Drainage Area*, 274 Mont. 340, 908 P.2d 1353, 1355 (1995). While an appropriator's bona fide intent may be based upon future use, his intent cannot be based on "mere future speculative profit or advantage." *Toohey*, 24 Mont. at 17, 60 P. at 397. Rather, the appropriator's intent must be "bona fide" and cannot be a "mere afterthought." *Bailey*, 45 Mont. at 178, 122 P. at 583. "The intention of the claimant is therefore a most important factor in determining the validity of an appropriation of water." *Miles v. Butte Elec. & Power Co.*, 32 Mont. 56, 67, 79 P. 549, 553 (1905). Accordingly, it "becomes the duty of the courts to try the question of the claimant's intent," and thereby separate *bona fide intent* from *mere future speculation*. *Miles*, 32 Mont. at 67, 79 P. at 554.

¶107 Here, the passage of time afforded the Water Master with over a hundred years of hindsight to help decipher bona fide intent from mere future speculation. The Water

Master made express findings regarding Pondera's annual irrigation.[9]  The Master found that in the 100 year time span between 1884 and 1994 the most Pondera beneficially irrigated in any year was 56,556 acres, which the Master found occurred in 1921.  The Master further noted that—prior to the installation of sprinkler systems in the 1990s and the subsequent acquisition of lands in the 2000s—Pondera's system peaked in 1921.  Summarizing the Water Master's findings of beneficial use by decade, the Master found that Pondera's maximum annual irrigation was 49,278 acres in the 1910s; 56,556 acres in the 1920s; 46,517 acres in the 1930s; 42,804 acres in the 1940s; 25,941 acres in the 1950s; 37,378 acres in the 1960s; 44,505 acres in the 1970s; and 51,006 acres in the 1980s.

¶108  Pondera's historical beneficial use provided the Water Master with overwhelming evidence of intent.  While there may be some room for disagreement in trying the original appropriators' bona fide intent, sufficient evidence supports the Master's finding that limits Pondera's water rights to an annual irrigation of 56,556 acres.  Pondera's beneficial use in the hundred years following the undertaking of original appropriations—wherein the most Pondera irrigated in a single year was 56,556 acres—provided substantial evidence of an intent to irrigate no more than 56,556 acres per year.  Additionally, there is no evidence in the record demonstrating that the original appropriators—at the time they undertook their respective appropriations—desired to irrigate 72,000 acres per year.  Furthermore, even if evidence did exist in the record showing an initial desire to irrigate

---

[9] I frequently use "Pondera" in this section to also include its predecessors, but also use "original appropriators" and "Pondera's predecessors" as well when emphasizing that *original* intent is the limiting factor of a water right.

54

that amount annually, the last 130 years make clear that such a desire was an expression of conjecture, reflecting a "gleam-in-the-eye philosophy" regarding the future use of the water. Substantial evidence supports the Water Master's finding. The Water Master did not clearly err by limiting Pondera's water rights based on historical evidence of beneficial use.

¶109 Our decision in *Bailey* does not require a different result. First, and foremost, unlike in *Bailey*, where this Court determined the corporation's bona fide intent based on 20 years of evidence, in the present case, we are 130 years removed from the undertaking of the original appropriations. As a result, we have considerable more evidence of bona fide intent than we had in *Bailey*. The importance of the 130 years of retrospection to the task of determining bona fide intent cannot be overstated. Second, the facts differ greatly from those in *Bailey*. In *Bailey*, the original appropriators expressed a desire to appropriate 5,000 miner's inches when they undertook the appropriation; the corporation built a ditch with a capacity of 2,200 miner's inches within 4 years; and the corporation put 1,430 miner's inches to actual beneficial use within 15 years. *Bailey*, 45 Mont. at 161-65, 122 P. at 577-78. Here, the original appropriators did not express a desire to irrigate 72,000 acres per year when they undertook the appropriations; Pondera did not have the ability to irrigate 72,000 acres per year until 60 years after the undertaking of the appropriations; and Pondera has failed to put water to beneficial use on 72,000 acres in any year within the last 130 years. *Bailey* is readily distinguishable from the present case. The Water Court erred by concluding that the Water Master clearly erred in limiting Pondera's irrigation rights to 56,556 acres per year when substantial evidence

55

exists in the record showing that Pondera's predecessors did not have a bona fide intent to irrigate more than that amount per year.

### (b) Reasonably Anticipated Needs

¶110   The requirement that an appropriator demonstrate that his reasonably anticipated needs require the use of water and the requirement of bona fide intent are closely related. The reasonably anticipated needs of an appropriator limit the water right "irrespective of the excessive size or number of ditches by him constructed or the amount of water claimed." *O'Shea v. Doty*, 68 Mont. 316, 320, 218 P. 658, 659 (1923).

¶111   Here, the evidence of Pondera's historical beneficial use—showing over a hundred years of irrigating less than 56,556 acres per year—is also relevant to Pondera's reasonably anticipated needs. Additionally, Pondera's outstanding shares—the number of shares held by the landowners—may have also been relevant to this inquiry. However, both the outstanding shares and treasury shares were unavailable to the Water Master.[10] Despite discovery requests from Curry and a subsequent order by the Water Master, Pondera steadfastly refused to provide its stock certificates. Curry seemingly did manage to procure copies of Pondera's stock certificates for the year 1948, however, and introduce the certificates into evidence. Based on this information, the Master found that,

---

[10] I use the term "issued shares," as did the Water Master, to denote the sum of the "outstanding shares" and the "treasury shares." An "outstanding share" is a share of a corporation that has been authorized, issued, and purchased by subscribers and held by them. *Black's Law Dictionary* 1643 (Bryan A. Garner ed., 10th ed. 2014). A "treasury share" is a share of a corporation that has been authorized, issued, but retained or reclaimed by the corporation. *Black's Law Dictionary* at 1643. Thus, I use the term outstanding shares to represent the shares sold and held by the landowners, and I use the term treasury shares to represent those shares that are held by Pondera. Although there seems to be some confusion over the meaning of these terms, this appears to be the way in which the parties generally understood the terminology.

in 1948, Pondera issued approximately 72,000 shares of stock. The Master also found that—of the approximately 72,000 shares issued—only 54,213 shares were outstanding. As the stock certificates were unavailable, the record does not reveal when, if ever, Pondera sold the full 72,000 issued shares to landowners. Testimony from Fay Stokes, the former general manager of Pondera, indicated that prior to the installation of sprinkler systems, Pondera was unable to sell the shares because of a lack of demand by landowners. The available evidence of Pondera's needs further demonstrates that the Water Master did not clearly err by limiting Pondera's water rights based on historical beneficial use.

¶112 Pondera persists that the Water Master and Curry are incorrect in their understanding of Pondera's historical beneficial use. Pondera maintains that it has historically put 72,000 acres per year of water to beneficial use since 1953, reasoning that issuing stock up to its allowed acreage maximum as authorized by the MCLB is a beneficial use. Pondera maintains that both *Bailey* and the Montana Constitution expressly recognize this principle.

¶113 Pondera's reliance on *Bailey* and the Montana Constitution is misplaced. While *Bailey* arguably recognized that the "sale of water" for a beneficial use is itself a beneficial use, *Bailey* certainly did not recognize that "offering to sell water" is a beneficial use. Contrary to Pondera's understanding, this Court in *Bailey* did not permit the public service corporation, at issue there, a water right in the amount of 2,200 miner's inches—in lieu of 1,430 miner's inches—based upon the principle that offering to sell water is an actual beneficial use. Rather, the Court permitted the corporation the

57

additional 770 miner's inches because it recognized that a completed appropriation for a public service corporation could rest on future beneficial use; that is to say, the future *sale of water* to irrigators to be put to beneficial use. Whether the 770 miner's inches in *Bailey* is characterized as *future* beneficial use, *contemplated* beneficial use, *prospective* beneficial use, or *constructive* beneficial use, it does not represent *actual* beneficial use. That Pondera has continually offered water for sale on 72,000 acres per year is not representative of its existing beneficial use. Pondera's actual beneficial use is represented by the water that it sells for a beneficial use, not the water that it offers to sell.

¶114   To conclude otherwise would be tantamount to sanctioning speculation, permitting water rights to be created without any actual use and then held indefinitely without any actual use until the appropriator sees fit. While speculation is commonplace with other commodities, it has long been settled in this State that water is far too scarce of a resource to speculate with. *Thorp v. Freed*, 1 Mont. 651 (1872). The adoption of Pondera's interpretation of *Bailey* would without a doubt fundamentally alter Montana water law.

¶115   I believe the Court makes the gravest of mistakes in doing so today. As the Colorado Supreme Court explained in rejecting a similar argument, "The right to appropriate is for *use*, not merely for profit." *Colo. River Water Conservation Dist. v. Vidler Tunnel Water Co.*, 197 Colo. 413, 417, 594 P.2d 566, 568 (1979) (emphasis in original). Allowing an appropriator to obtain an appropriation and hold the appropriation based merely on his ability to provide water for sale will "encourage those with vast monetary resources to monopolize, for personal profit rather than for beneficial use,

whatever unappropriated water remains." *Colo. River Water Conservation Dist.*, 197 Colo. at 417, 594 P.2d at 568. We should emphatically reject the argument advanced by Pondera and refuse to countenance the "claim that mere speculators, not intending themselves to appropriate and carry water to a beneficial use or representing others so intending, can by survey, plat, and token construction compel subsequent bona fide appropriators to pay them tribute by purchasing their claims in order to acquire a right guaranteed them by our Constitution." *Colo. River Water Conservation Dist.*, 197 Colo. at 417, 594 P.2d at 568-69.

¶116 In sum, Pondera's offering 72,000 shares of stock for sale does not represent beneficial use. Pondera's offering water for sale represents nothing more than an attempt to speculate with a resource owned by the People of the State of Montana. Our Constitution guarantees a right to appropriate for beneficial use; it does not guarantee a right to speculate. I would thus reject Pondera's argument that issuing shares of stock— or, for that matter, any other method of offering water for sale—is an actual beneficial use of water.

¶117 Lastly, in the face of a hundred years of irrigating less than 56,556 acres per year and in the absence of any evidence showing in the last century it has ever irrigated 72,000 acres in a year, Pondera argues that its compliance with the Carey Land Act demonstrates intent to irrigate 72,000 acres per year.

¶118 Assuming, for the purposes of argument, that the demonstration of a desire to follow a legislative act is adequate to overcome the bona fide intent that can be gleaned from actual beneficial use over the past century, the Water Master correctly rejected

59

Pondera's reliance on the Carey Land Act. The Water Master concluded that Pondera's suggestion that its early predecessors intended to take advantage of that legislation is speculative and unfounded. The Master noted generally that Pondera's early water rights largely fall into two main categories: (1) water rights established by individual appropriators in the late 19th century, with priority dates ranging from April 9, 1884, through September 18, 1901, and (2) water rights established by the Conrad brothers in the early 20th century, with priority dates ranging from June 21, 1900, through April 12, 1906.

¶119 The Water Master found that neither of these two categories of water rights were initiated with the Carey Land Act in mind. First, the Master explained that Congress enacted the Carey Land Act into law on August 18, 1894, and that "[n]o claim with a priority date before then can be credibly urged as intended to take advantage of the [A]ct." Second, the Master noted that, even after the passage of the Carey Land Act, the Act further required Montana to enact enabling legislation before landowners could utilize the Act, which occurred in 1903.[11] Third, the Water Master found that the earliest any appropriator formed a construction company in the Valier area, which is necessary to comply with the Act, was in 1908. Lastly, the Water Master found that the intention of the Conrad brothers "was to serve their own empire" and that the "Carey Land Act idea came later." The Water Master explained the Conrad brothers "were looking to irrigate 9,600 acres, not 72,000." Thus, the Water Master expressly rejected Pondera's

---

[11]Section 18-2001, RCM (1903), et seq.

60

suggestion "that the early rights of its predecessors were acquired for gradual development of what became the Carey Land Act project."

¶120 Our decision in *Toohey* is consistent with the Water Master's decision. In that case, an appropriator, Flannery, evinced intent to appropriate water in 1868 by the construction of ditches and the installation of fencing surrounding his property. *Toohey*, 24 Mont. at 17, 60 P. at 397. In 1873, Congress passed the Timber Culture Act, permitting homesteaders to acquire up to an additional 160 acres of land provided they met certain requirements. In 1876, Flannery claimed an additional 160 acres under the Act. Thirteen years later, in 1889, Flannery applied water to beneficial use on both the lands owned prior to the passage of the Act as well as the lands subsequently acquired under the Act. *Toohey*, 24 Mont. at 18, 60 P. at 397.

¶121 On appeal to this Court, Flannery maintained that he could acquire enough water for use on all his lands. We rejected his argument, explaining that a person cannot acquire any part of a stream for "mere future speculative profit or advantage." *Toohey*, 24 Mont. at 17, 60 P. at 397. We reasoned: "As the timber-culture act was not passed until 1873, and was not proceeded under by Flannery until 1876, he could not have had in contemplation [irrigation of the additional lands] under this law before its enactment by congress." *Toohey*, 24 Mont. at 18, 60 P. at 397. Thus, we concluded that "his intent, in 1868, in the then present and contemplated use of the water then diverted, never reached beyond the purpose of irrigating the part of the [original] tract." *Toohey*, 24 Mont. at 18, 60 P. at 397.

¶122 Here, like Flannery, Pondera cannot rely on a legislative act to establish intent when its claims predate the passage of the legislative act; predate the enabling legislation; and predate an attempt by its predecessors to proceed under the legislation. Congress enacted the Carey Land Act into law on August 18, 1894; Montana enacted enabling legislation to implement the Act in 1903; and none of Pondera's early predecessors proceeded under the Carey Land Act until the earliest 1908. Four of Pondera's consolidated claims entirely predate the passage of the Carey Land Act; twenty-one predate the passage of Montana's enabling legislation; and all of the early claims predate any attempt by Pondera's predecessors to proceed under the Act. Thus, "[a]s the [Carey Land] act was not passed until 18[94], and was not proceeded under by [Pondera's predecessors] until [1908], [they] could not have had in contemplation [irrigation of lands] under this law." *Toohey*, 24 Mont. at 18, 60 P. at 397.

¶123 Moreover, even if we were to break from this long-standing precedent and overrule *Toohey*, there is an absence of evidence in the record showing that any original appropriators of its early claims actually did intend to rely on the Carey Land Act. In fact, Pondera appears to agree that its predecessors did not contemplate taking advantage of the Carey Land Act until W.G. Cargill purchased the Conrad brothers' interest in 1907, which is well after original appropriators undertook appropriations—in several instances, two full decades afterwards.

¶124 If there is one universal rule in western water law, it is that the future beneficial use of the water "must have been within the appropriator's *original* intent in undertaking such appropriations." Hutchins, 496 (emphasis in original). We have reiterated this rule

on numerous occasions, stating it is the appropriator's *"intent at the time of appropriation"* that controls the extent of the water right. *In re Adjudication of Existing Rights to the Use of all Water*, ¶ 22 (emphasis in original). *Accord Wheat*, 64 Mont. at 501, 210 P. at 762; *Toohey*, 24 Mont. at 18, 60 P. at 397; *Teton Co-Op Canal Co.*, ¶ 33. Further, in case there be any doubt, we expressly adhered to this principle in *Bailey*, concluding that "at the time of the *initiation* of appellant's right in 1892 [the original appropriators] had the bona fide intention *at the time* to apply the water, which they sought to appropriate, to a useful and beneficial purpose." *Bailey*, 45 Mont. at 178-79, 122 P. at 583 (emphasis added).

¶125 I see no reason to deviate from over a hundred years of precedent and thereby create a special exception for Pondera. The Water Master correctly rejected Pondera's reliance on the Carey Land Act to show intent to irrigate 72,000 acres per year. The record supports the Water Master's determination that Pondera's early predecessors did not contemplate irrigation under the Carey Land Act.

¶126 Based upon the foregoing, I would conclude that the Water Master did not clearly err by limiting Pondera's water rights based on historical beneficial use. Pondera presented the Water Master with a number of different claims; with a number of different priority dates; and with a number of different original appropriators. Using historical beneficial use was not only an acceptable way to determine the extent of Pondera's

collective water rights, it was likely the only way.[12]  In light of the overwhelming evidence of historical beneficial use and in the absence of other clear evidence of original intent, the Water Master correctly limited Pondera's water rights based on historical beneficial use.  Substantial evidence supports the Water Master's finding limiting Pondera's irrigation rights to 56,556 acres per year.  Accordingly, the Water Court erred in reversing the Water Master's finding.[13]

*(2)  Whether the Water Court correctly concluded that the Water Master clearly erred in finding Pondera's place of use should be the approximately 85,000 acres listed on the share certificates.*

¶127    Curry contends that the Water Court erred in reversing the Water Master's finding that Pondera's place of use should be the acres listed on Pondera's share certificates and maintains that the Water Master's order that requires Pondera to supplement the record with a list of the share certificates should be reinstated.

---

[12] The Court also appears to place great emphasis on the MCLB to show intent.  Neither the MCLB nor any other public agency had jurisdiction over the acquisition of appropriative water rights in 1953.  Sections 89-848, -849, -851, RCM (1969).  And, more importantly, the MCLB's function was not to try the intent of the original appropriators.

[13] Alternatively, assuming Ponderas completed appropriations with an annual irrigation of 72,000 acres, as Curry correctly argues in the alternative "that claim was lost by failure to put the water to a beneficial use within a reasonable time."  Thus, assuming Pondera perfected water rights in 1921 with a total annual irrigation of 72,000 acres, the rights were lost by Pondera's "nonuser for an unreasonable length of time." *Bailey*, 45 Mont. at 179, 122 P. at 584.  The Court's reasoning to the contrary is unsupported.  The Court maintains that "*Bailey* clearly states that . . . the right cannot be lost based upon the acts by a third-party shareholder . . . ." Opinion, ¶ 34. *Bailey* does not stand for such a proposition.  Rather, *Bailey* clearly states that the appropriation "cannot be made to depend for its existence in the *first instance* upon the voluntary acts of third parties— strangers to its undertaking." *Bailey*, 45 Mont. at 178, 122 P. at 583 (emphasis added).  In other words, a public service corporation must be able to complete an appropriation unaided by third parties, which the growing communities doctrine allows an appropriator to do.  However, under *Bailey*, an appropriator's beneficial use remains entirely dependent on the individual appropriators.  The corporation's beneficial use depends on the amount of water it "sells" for a beneficial use—which, in turn, wholly depends on the amount of water the irrigators buy and put to beneficial use.  Thus, Pondera's nonuse is based entirely on the irrigators' nonuse.

¶128  The Water Master found that Pondera's place of use should be the total acres described on the share certificates.  Testimony at trial indicated that the acres described on the share certificates correlated to historical use.  The Water Master noted, however, that if the area described on the share certificates deviates substantially from 85,000 acres the acreage listed is in error.  The Master explained that the Department of Natural Resources and Conservation (DNRC) verified 85,296 irrigable acres under Pondera's system using data from the Pondera County Water Resources Survey (WRS) and 85,357 irrigable acres using data from the United States Department of Agriculture (USDA).  Thus, the Water Master stayed the proceedings and its final determination until Pondera produced its share certificates.

¶129  There is no error in the Water Master's analysis limiting Pondera's place of use to the area described on the share certificates.  Here again, the Water Master's reliance on historical beneficial use was an acceptable method to determine the extent of Pondera's rights.  The evidence in the record indicates that Pondera has historically irrigated an area no larger than 85,000 acres in the last 130 years.  In 1920, Pondera's chief engineer, C.E. Atwood, compiled a list of irrigable acres under Pondera's system and concluded that 85,527 acres were irrigable.  Similarly, the WRS Report, written by the State Engineer in 1964, concluded that Pondera's irrigation project has been "operated and maintained adequately with approximately 80,000 acres of land being served."  The WRS Report further concluded that Pondera "had 83,303.20 acres irrigated in 1963 and 2,438 acres potentially irrigable."  Testimony at trial also indicated that Pondera irrigates approximately 80,000 acres.  Lastly, Pondera conceded in its motion for summary

judgment that it currently irrigates 85,375.8 acres. Thus, based on this overwhelming evidence of intent to irrigate 85,000 acres, the Water Master did not clearly err in delineating a place of use for Pondera that is approximately 85,000 acres.

¶130 The question then becomes the location of the 85,000 acres that Pondera is entitled to claim as its place of use. The Water Use Act required the Water Master to determine Pondera's place of use as it existed prior to July 1, 1973. Section 85-2-227(1), MCA. Based on the testimony at trial, the share certificates accurately reflect each and every acre Pondera irrigated prior to July 1, 1973, which testimony established totals approximately 85,000 acres. Pondera did not offer any evidence of historical use at trial. Nor did Pondera take issue with the testimony at trial that the acres described on the share certificates accurately reflect the historical use of its water rights. Given the evidence of historical use, the Water Master did not clearly err by finding that Pondera's place of use as it existed prior to July 1, 1973, was the approximately 85,000 acres described on the share certificates. The Water Court erred by reversing the Water Master's finding. I would reinstate the Water Master's order requiring that Pondera produce its share certificates pursuant to Curry's discovery request.[14,15]

---

[14] The Court maintains that Curry merely was unable to successfully refute the evidence of the size of the service area at this stage in the process. Opinion, ¶ 50. But it is unclear what evidence Curry could have presented to do so. In the course of a five-day trial, Curry produced witnesses whose testimony indicated that Pondera did not intend to irrigate 377,000 acres, including Pondera's former general manager, Fay Stokes; Curry produced data from the USDA, data from the DNRC, the WRS Report from the State Engineer, and the report from Pondera's former chief engineer, C.E. Atwood, all showing no intent to irrigate 377,000 acres; and Curry introduced aerial mapping showing no intent to irrigate 377,000 acres. Furthermore, during oral argument, Pondera's counsel conceded that Pondera does not contemplate irrigating 377,000 acres. A claimed place of use under § 85-2-227(1), MCA, is *prima facie* proof, *not conclusive* proof. The fundamental problem appears to be with the Court's use of the term "service area."

III.

¶131 I believe that the principles the Court announces today will ultimately prove unsound. The Court today allows an appropriator to claim an appropriation to irrigate 72,000 acres per year and permits the appropriator to irrigate a 377,000 acre area. It does so despite the fact that the appropriator has failed to irrigate 72,000 acres in any year or irrigate a 377,000 acre area since the inception of the appropriator's rights some 130 years ago. Worse yet, the Court holds that for those appropriators, who are engaged in the business of selling water, beneficial use does not require actual use, but instead is the availability of water for sale. There is no doubt in my mind that the rampant speculation that will ensue from this decision will force this Court's hand to either expressly overrule the decision or distinguish it from future cases based on inconsequential facts.

¶132 The Court seems to acknowledge as much already and attempts to use the general adjudication as a fail-safe, remarking that its decision is not definitive "at this stage in the adjudication process." Opinion, ¶ 50. In my view, the Court's fail-safe is woefully

_____

The term is undefined and thus unable to be qualified. However, it does appear clear that bona fide intent is not a limiting factor. If so, Curry would have easily rebutted the presumption.

[15] As a final note, there is language in the Water Master's report that would seem to suggest that Pondera cannot reassign its corporate shares to lands within or outside its place of use without seeking authorization from the DNRC. However, despite this language, the Water Master did not add a remark to any of Pondera's claims to this effect. Nor did the Water Master, in its final recommendation to the Water Court, recommend that the Water Court add such a remark. And neither Curry nor Pondera brief the issue. Thus, I will not attempt to ascertain the meaning of the Water Master's comments or provide a definitive ruling on them. If in the event the Water Master adds a remark on Pondera's claims stating that it cannot reassign corporate stock to a different area within or outside its place of use without authorization by the DNRC, Pondera can certainly appeal the issue. I would add, however, that if Pondera seeks to change its place of use from the place delineated on its individual appropriations—the total lands described on the share certificates—Pondera would certainly need to seek DNRC approval. *See* §§ 85-2-302, -402, MCA.

67

unacceptable. First, I cannot see how the "adjudication process" will change the Court's rules of law or its express holdings regarding the facts of this case. Pondera's beneficial use will remain nonuse in the general adjudication. And, if over a century of nonuse does not persuade this Court that Pondera's water rights are less than Pondera claims, nothing will. Second, even if the Court's rules were so malleable that the general adjudication would somehow change them, in my view the looming general adjudication is an unacceptable excuse to kick the can down the road. I am sure Curry would have wished to wait for the general adjudication as well, but that was not an option he was presented with. Beginning in the 2000s, Pondera started irrigating more acres per year and in more places than it had done in the previous century. In aid of its growing needs, Pondera locked Curry's headgate, thereby threatening Curry's way of life. In short, Pondera sought to compel Curry to pay tribute for a century of Pondera's existence in the area and to finally earn a reward for decades of speculation, *Colo. River Water Conservation Dist.*, 197 Colo. at 417, 594 P.2d at 568-69, which left Curry with no choice but to seek redress and a court determination of the extent of Pondera's water rights. There is no excuse for this Court to wait until the general adjudication to determine the annual acreage and place of use for Pondera's water rights. The parties raised those issues below and now have squarely presented those issues to this Court for review.

¶133   I agree with the Court's resolution of Issue 5. In respect to Issue 4, it is my view the Water Court substituted its judgment for that of the Water Master regarding the Gray Right, and I would affirm the Water Master on the Gray Right. After a review of the

record, substantial evidence supports the Water Master's finding of a flow rate of 0.95 cfs.

/S/ LAURIE McKINNON